## McGEE v. UNITED STATES

No. 362.  Argued February 23, 1971—Decided May 17, 1971

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACK, HARLAN, BRENNAN, STEWART, WHITE, and BLACK-MUN, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 492.

*Alan H. Levine* argued the cause for petitioner.  With him on the briefs were *Marvin M. Karpatkin* and *Melvin L. Wulf*.

*William Bradford Reynolds* argued the cause for the United States *pro hac vice*. With him on the brief were *Solicitor General Griswold* and *Assistant Attorney General Wilson*.

*Marvin B. Haiken* filed briefs for Richard Kenneth LeGrande as *amicus curiae*.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioner was convicted of failing to submit to induction and other violations of the draft laws. His principal defense involves the contention that he had been incorrectly classified by his local Selective Service board. The Court of Appeals ruled that this defense was barred because petitioner had failed to pursue and exhaust his administrative remedies. We granted certiorari, 400 U. S. 864 (1970), to consider the applicability of the "exhaustion of administrative remedies" doctrine in the circumstances of this case.

I

In February 1966, while attending the University of Rochester, petitioner applied to his local Selective Service board for conscientious objector status. In support of his claim to that exemption he submitted the special form for conscientious objectors (SSS Form 150), setting forth his views concerning participation in war.[1] The board continued petitioner's existing classification—student de-

---

[1] In this connection he noted that he intended "to continue on to actual ordained Priesthood." After registering for the draft in 1961, petitioner had informed the local board that he was then a student at a Catholic seminary, preparing for the ministry under the direction of the Roman Catholic Church. Subsequently he left the seminary and later enrolled at the University of Rochester, a secular university.

ferment—and advised him that the conscientious objector claim would be passed upon when student status no longer applied.

In April 1967 petitioner wrote to President Johnson, enclosing the charred remnants of his draft cards and declaring his conviction that he must "sever every link with violence and war." The letter included a statement that petitioner had "already been accepted for graduate study in a program where I would probably qualify for the theological deferment." A copy of the letter was forwarded to the local board; the board continued petitioner's student deferment. Petitioner graduated in June 1967, and thereafter the board sent him a current information questionnaire (SSS Form 127), which asked *inter alia* for specific information concerning his future educational plans and generally for any information he thought should be called to the board's attention. Petitioner returned the questionnaire unanswered and announced in a cover letter that henceforth he would adhere to a policy of noncooperation with the Selective Service System.

In September 1967 the board reviewed petitioner's file, rejected the pending conscientious objector claim,[2] and reclassified petitioner I-A. In response to his reclassification petitioner sought neither a personal appearance before the local board nor review by the appeal board. Indeed, pursuant to his policy of noncooperation, he returned to the board, unopened, the communication notifying him of the reclassification and of his right to appear before the local board, to confer with the Government appeal agent, and to appeal. Petitioner did not appear for a physical examination ordered to take place in October 1967. He did respond to an order to appear

[2] See n. 10, *infra*.

for induction in January 1968, and he took a physical examination at that time. However, he refused to submit to induction.

Petitioner was prosecuted, under § 12 (a) of the Military Selective Service Act of 1967, 62 Stat. 622, as amended, 50 U. S. C. App. § 462 (a) (1964 ed., Supp. V) and applicable Selective Service regulations,[3] for failing to submit to induction (count I), failing to report for a pre-induction physical examination (count II), failing to keep possession of a valid classification notice (count III), and failing to submit requested information relevant to his draft status (count IV). Petitioner was convicted on all four counts and sentenced to two years' imprisonment on each count, the sentences to run concurrently. Petitioner's principal defense to liability for refusing induction[4] was that the local board had erred in classifying him I-A.[5] The Court of Appeals, with one judge dissenting, held that the defense of incorrect classification was barred because petitioner had failed to exhaust the administrative remedies available for correction of such an error. The conviction was affirmed by the Court of Appeals.

---

[3] See 32 CFR § 1632.14; 32 CFR § 1628.16; 32 CFR § 1623.5; 32 CFR § 1641.7 (b).

[4] In the Court of Appeals, as here, petitioner argued that the defense of erroneous classification would, if valid, defeat criminal liability for acts charged under counts II and III, as well as count I.

[5] Petitioner contended, as he does in this Court, that the board erroneously failed to pass on the merits of his conscientious objector claim when reclassifying him in September 1967, that at any rate the board erred in denying conscientious objector status, and also that the board erred in failing to grant him a ministerial student exemption. Petitioner had matriculated at Union Theological Seminary in September 1967, after being reclassified I-A. He had never, however, requested that he be classified as exempt from the draft as a ministerial student. See *infra*, at 486–488.

## II

Two Terms ago, in *McKart* v. *United States,* 395 U. S. 185 (1969), the Court surveyed the place of the exhaustion doctrine in Selective Service cases, and the policies that underpin the doctrine. As it has evolved since *Falbo* v. *United States,* 320 U. S. 549 (1944), and *Estep* v. *United States,* 327 U. S. 114 (1946), the doctrine when properly invoked operates to restrict judicial scrutiny of administrative action having to do with the classification of a registrant, in the case of a registrant who has failed to pursue normal administrative remedies and thus has sidestepped a corrective process which might have cured or rendered moot the very defect later complained of in court. Cf. *Oestereich* v. *Selective Service Board,* 393 U. S. 233, 235–236, n. 5 (1968); *Gibson* v. *United States,* 329 U. S. 338, 349–350 (1946). *McKart* stands for the proposition that the doctrine is not to be applied inflexibly in all situations, but that decision also plainly contemplates situations where a litigant's claims will lose vitality because the litigant has failed to contest his rights in an administrative forum. The result in a criminal context is no doubt a substantial detriment to the defendant whose claims are barred. Still this unhappy result may be justified in particular circumstances by considerations relating to the integrity of the Selective Service classification process and the limited role of the courts in deciding the proper classification of draft registrants.[6]

---

[6] Certainly it is late in the day to launch a broadside against the whole scheme of the exhaustion doctrine in Selective Service cases, as petitioner attempts, on the ground that a doctrine of the same name operates in some other legal context simply to inhibit premature access to the courts on the part of a litigant seeking affirmatively to challenge agency action. Cf. *McKart* v. *United States,* 395 U. S. 185, 193–195 (1969). Nor is it tenable to say that

484

## A

After *McKart* the task for the courts, in deciding the applicability of the exhaustion doctrine to the circumstances of a particular case, is to ask "whether allowing all similarly situated registrants to bypass [the administrative avenue in question] would seriously impair the Selective Service System's ability to perform its functions." 395 U. S., at 197. *McKart* specified the salient interests that may be jeopardized by a registrant's failure to pursue administrative remedies. Certain failures to exhaust may deny the administrative system important opportunities "to make a factual record" for purposes of classification, or "to exercise its discretion or apply its expertise" in the course of decisionmaking. *Id.*, at 194. There may be a danger that relaxation of exhaustion requirements, in certain circumstances, would induce "frequent and deliberate flouting of administrative processes," thereby undermining the scheme of decisionmaking that Congress has created. *Id.*, at 195. And of course, a strict exhaustion requirement tends to ensure that the agency have additional opportunities "to discover and correct its own errors," and thus may help to obviate all occasion for judicial review. *Ibid.*

To be weighed against the interests in exhaustion is the harsh impact of the doctrine when it is invoked to bar any judicial review of a registrant's claims. Surely an insubstantial procedural default by a registrant should

---

the doctrine is inappropriate when fashioned by judicial decision rather than specific congressional command. See *id.*, at 193–194, 197; *id.*, at 206 (WHITE, J., concurring in result). The whole rationale of the exhaustion doctrine in the present context lies in purposes intimately related to the autonomy and proper functioning of the particular administrative system Congress has constructed. See generally *Mulloy* v. *United States*, 398 U. S. 410, 416 (1970); *Witmer* v. *United States*, 348 U. S. 375, 380–381 (1955).

not shield an invalid order from judicial correction, simply because the interest in time-saving self-correction by the agency is involved. That single interest is conceivably slighted by any failure to exhaust, however innocuous the bypass in other respects, and *McKart* recognizes that the exhaustion requirement is not to be applied "blindly in every case." *Id.*, at 201. *McKart* also acknowledges that the fear of "frequent and deliberate flouting" can easily be overblown, since in the normal case a registrant would be "foolhardy" indeed to withhold a valid claim from administrative scrutiny. *Id.*, at 200. Thus the contention that the rigors of the exhaustion doctrine should be relaxed is not to be met by mechanical recitation of the broad interests usually served by the doctrine, but rather should be assessed in light of a discrete analysis of the particular default in question, to see whether there is "a governmental interest compelling enough" to justify the forfeiting of judicial review. *Id.*, at 197.

In the *McKart* case, the focal interest for purposes of analysis was the interest in allowing the agency "to make a factual record, or to exercise its discretion or apply its expertise." There the registrant had failed to take an administrative appeal from the local board's denial of "sole surviving son" status. Later the issue of McKart's entitlement to that exempt status arose in a criminal context, and the Court held that the claim should be heard as a defense to liability despite the failure to exhaust. The validity of the claim was a question "solely . . . of statutory interpretation." *Id.*, at 197–198. McKart's failure to exhaust did not inhibit the making of an administrative record—all the relevant facts had been presented. *Id.*, at 198 n. 15. The issue was not one of fact and thus its resolution would not have been aided by the exercise of special administrative expertise; and proper interpretation of the statutory provision in question was not a matter for agency discretion.

In the present case the same interest is pivotal—but here it is apparent that McGee's failure to exhaust did jeopardize the interest in full administrative fact gathering and utilization of agency expertise, rather than the contrary. Unlike the dispute about statutory interpretation involved in *McKart*, McGee's claims to exempt status—as a ministerial student or a conscientious objector—depended on the application of expertise by administrative bodies in resolving underlying issues of fact. Factfinding for purposes of Selective Service classification is committed primarily to the administrative process, with very limited judicial review to ascertain whether there is a "basis in fact" for the administrative determination. See 50 U. S. C. App. § 460 (b)(3) (1964 ed., Supp. V); *Estep* v. *United States*, 327 U. S., at 122–123; cf. *Witmer* v. *United States*, 348 U. S. 375, 380–381 (1955). *McKart* expressly noted that as to classification claims turning on the resolution of particularistic fact questions, "the Selective Service System and the courts may have a stronger interest in having the question decided in the first instance by the local board and then by the appeal board, which considers the question anew." 395 U. S., at 198 n. 16. See *id.*, at 200–201. This "stronger interest," in the circumstances of the present case, has become compelling and fully sufficient to justify invocation of the exhaustion doctrine.

## B

Petitioner argues that denial of exemption as a ministerial student was erroneous, but he had never requested that classification nor had he submitted information that would have been pertinent to such a claim. In regard to his entitlement to this exempt status, McGee made no effort to invoke administrative processes for factfinding, classification, and review, It is true that vagrant bits of information may have come to the attention of the local

board raising a bare possibility that petitioner might qualify as a ministerial student,[7] but this hardly changes the picture of a thoroughgoing attempt to sidestep the administrative process and make the first serious case for an exemption later in court.

Such a default directly jeopardizes the functional autonomy of the administrative bodies on which Congress has conferred the primary responsibility to decide questions of fact relating to the proper classification of Selective Service registrants.[8]  See *McKart* v. *United States*,

---

[7] Petitioner's letter to President Johnson, a copy of which was transmitted to the board, declared that petitioner's future graduate studies in his own view "would probably qualify" him for the ministerial student exemption.  This is the sole communication from petitioner that actually reached the board, however circuitously, and contained a hint of petitioner's projected studies at the Union Theological Seminary, though the letter did not say where petitioner intended to study and it gave no information whatever on other matters critical to ministerial student status.  See n. 9, *infra*.  Petitioner's reliance on information communicated by him, not to the local board, but to certain FBI agents and to an assistant United States attorney, is even more farfetched.

[8] Local Board Memorandum No. 56 (August 18, 1954) prescribes that "[t]o substantiate the claim of a registrant that he is a theological student, the local board must require him to furnish" certain relevant evidence.  Petitioner contends that this directive places the burden of fact gathering on the board and relieves him of the responsibility to produce unsolicited evidence relevant to a ministerial student claim.  However, in petitioner's case there was no "claim of a registrant" before the board, and at any rate the board's fact-gathering efforts were thwarted by petitioner's refusal to fill out the current information questionnaire (SSS Form 127) sent to him.  Thus, we need not consider the relevance of the directive for exhaustion purposes in the case of a registrant who claims ministerial student status but falls short in his initial proofs.

Petitioner's emphasis on the mandatory statutory language relating to exemption of ministerial students, 50 U. S. C. App. § 456 (g) (such persons "shall be exempt"), is also misplaced.  This is not a case where, though no definite formal request for exemption is

395 U. S. 185, 198 n. 15 (1969); cf. 32 CFR § 1622.1 (c). Here the bypass was deliberate and without excuse, and this is not a case where entitlement to an exemption would be automatically made out, given a minimal showing by the registrant or minimal investigatory effort by the local board.[9] The exhaustion requirement is properly imposed where, as here, the claim to exemption depends on careful factual analysis and where the registrant has completely sidestepped the administrative process designed to marshal relevant facts and resolve factual issues in the first instance. Cf. *Dickinson* v. *United States*, 346 U. S. 389, 395–396 (1953).

## C

Petitioner did claim exemption as a conscientious objector to war. He filled out and returned the special form for conscientious objectors (SSS Form 150), and appended a further statement of beliefs, thereby making out a prima facie case for the exempt status. Since at that

made, entitlement to exemption is clear on information submitted. Indeed, even on the record as developed in the trial court below, much less on the scraps of information available to the Selective Service System, denial of exemption in petitioner's case is not unsupportable. See n. 9, *infra*.

[9] The Military Selective Service Act of 1967, 50 U. S. C. App. § 456 (g), provides that "students preparing for the ministry under the direction of recognized churches or religious organizations, who are satisfactorily pursuing full-time courses of instruction in recognized theological or divinity schools . . . shall be exempt . . . ." See 32 CFR § 1622.43 (a). Evidence aired at trial showed that after September 1967 petitioner was engaged in studies at Union Theological Seminary, a nondenominational seminary. There was some evidence that petitioner intended eventually to become a priest, but scant evidence, if any, tending to indicate that petitioner's studies were "under the direction" of his church. The Court of Appeals determined, in view of the trial record, that "denial of a [ministerial student] exemption to McGee would have had a 'basis in fact.'" 426 F. 2d 691, 696 (CA2 1970).

time—1966—petitioner held an undergraduate student deferment, the board postponed consideration of the claim to a "higher" classification. See 32 CFR § 1623.2. In 1967, after petitioner had graduated, the pending conscientious objector claim was reviewed [10] and rejected, and petitioner was classified I–A. Petitioner contends that denial of conscientious objector status was erroneous, but after the claim was rejected he did not invoke the administrative processes available to correct the error. He did not seek a personal appearance before the local board,[11] nor did he take an administrative appeal to contest the denial before the appeal board, which classifies *de novo.*[12]

That petitioner's failure to exhaust should cut off judicial review of his conscientious objector claim may seem too hard a result, assuming, as the Government admits, that the written information available to the board provided no basis in fact for denial of the exemption, and, as the Court of Appeals ruled, that neither did petitioner's conduct in relation to the conscription system or other acts that came into view. See 426 F. 2d 691, 697 (CA2 1970); *id.,* at 700–701 (dissenting opinion). But even assuming the above, petitioner's dual failure to exhaust—his failure either to secure a personal appearance or to take an administrative appeal—implicates decisively the policies served by the exhaustion requirement, especially the purpose of ensuring that the Selective Service System have full opportunity to "make

---

[10] Though the trial testimony was somewhat ambiguous, the District Judge found specifically that the local board had passed on the merits of petitioner's pending conscientious objector claim in September 1967, before reclassifying petitioner I–A. We do not disturb this finding, which was approved by the Court of Appeals majority below.

[11] See 32 CFR §§ 1624.1, 1624.2.

[12] See 32 CFR §§ 1626.2, 1626.26.

a factual record" and "apply its expertise" in relation to a registrant's claims. When a claim to exemption depends ultimately on the careful gathering and analysis of relevant facts, the interest in full airing of the facts within the administrative system is prominent, and as the Court of Appeals noted, the exhaustion requirement "cannot properly be limited to those persons whose claims would fail in court anyway." *Id.*, at 699.

Conscientious objector claims turn on the resolution of factual questions relating to the nature of a registrant's beliefs concerning war, *Gillette* v. *United States,* 401 U. S. 437 (1971), the basis of the objection in conscience and religion, *Welsh* v. *United States,* 398 U. S. 333 (1970), and the registrant's sincerity, *Witmer* v. *United States,* 348 U. S. 375, 381 (1955). See 50 U. S. C. App. § 456 (j) (1964 ed., Supp. V). Petitioner declined to contest the denial of his conscientious objector claim before the local board by securing a personal appearance, and the Selective Service System was thereby deprived of one opportunity to supplement the record of relevant facts. The opportunity would have been restored had petitioner sought review by the appeal board. While the local board apparently was satisfied that classification should be made on the basis of the record it confronted,[13] the appeal board, which classifies *de novo,* might have determined that the record should be supplemented by the local board.[14] See 32 CFR § 1626.23. In the circumstances of this case, petitioner's failure to take an administrative appeal not only deprived the appeal board of the opportunity to "apply its expertise" in factfinding to the

---

[13] Petitioner's board did not summon him for an interview to inquire into the sincerity of his claim prior to classification, as it might have done. See Local Board Memorandum No. 41, as amended July 30, 1968 (rescinded August 27, 1970).

[14] Local boards have wide fact-gathering powers. See 32 CFR §§ 1621.14, 1621.15, and 1625.1 (c).

record that was available; it also removed an opportunity to supplement a record containing petitioner's own submissions but not containing the results of any specific inquiry into sincerity.

The Government contends that unless the exhaustion requirement is imposed to bar judicial review when the failure to exhaust has the present character, registrants would be encouraged to sidestep the administrative processes once a prima facie claim to conscientious objector status is made out by submission of a carefully drafted Form 150. Should the claim be denied at the local board level, the claimant might be tempted to circumvent further fact-gathering processes, and take a chance on showing in court that the only administrative record available contains no basis in fact for denial of the claim. This somewhat extreme situation is indeed presented by the circumstances of the present case, though, of course, there is no reason to question the bona fides of McGee's own supervening policy of noncooperation with the conscription system. It remains that McGee's failure to pursue his administrative remedies was deliberate and without excuse. And it is not fanciful to think that "frequent and deliberate flouting of administrative processes" might occur if McGee and others similarly situated were allowed to press their claims in court despite a dual failure to exhaust.

### III

We conclude that petitioner's failure to exhaust administrative remedies bars the defense of erroneous classification,[15] and therefore the judgment below is

*Affirmed.*

---

[15] This defense figures in petitioner's challenge to his conviction on counts I, II, and III. The two-year sentences on each of the

MR. JUSTICE DOUGLAS, dissenting.

This is a case where so far every judge has agreed that McGee is a conscientious objector. He expressed his belief "in a personal Supreme Being to whom obligation is superior when duties of human relations are considered"; he said that "taking part in any form of military operation indicates an approval/consent situation repugnant . . . to love and service of God and fellowman." The majority of the Court of Appeals concluded that "[n]either his prior nor his subsequent actions were inconsistent with his assertions . . . and we see nothing in McGee's file—all that was before the board—that could reasonably put his sincerity in issue." 426 F. 2d 691, 697. Judge Feinberg in dissent agreed. *Id.*, at 703.

Petitioner was a Roman Catholic studying at the Union Theological Seminary in New York City, preparing for the ministry. His sincerity and dedication to his moral cause are not questioned.

The critical issue in the case is whether the Selective Service Board in 1966 did "consider" and reject the claim of the registrant that he was a conscientious objector. The District Court and a majority of the Court of Appeals held that the board did pass on the claim. And this Court now refuses to pass on the registrant's claim to the contrary, because, it says, that finding is not "clearly erroneous." That the finding is clearly erroneous seems apparent to one who reads the entire record.

The advice which the registrant received in a letter from the board, dated March 23, 1966, was as follows: "We wish to advise that your claim as conscientious objector will be considered when you no longer qualify for student classification." That letter states that de-

four counts are to run concurrently, and we decline to disturb the conviction on count IV, a minor offense indeed in comparison to the act involved in count I.

cision on the "claim as conscientious objector" will be passed on later. The inference is clear—that it was not then considered and decided.

The Chairman of the board testified that the conscientious objector claim was not considered, "because the young man was attending college and in my judgment he rated a 2S qualification which we proceeded to give him." He later testified that in February 1966 he, the Chairman of the board, felt "that there weren't sufficient facts in that to motivate me to grant the registrant the request he sought." Yet even that ambiguous statement is a far cry from concluding that the board rejected his claim to status as a conscientious objector. Indeed, it was the duty of the board under the Regulations to classify the registrant "in the lowest class for which he is determined to be eligible." 32 CFR § 1623.2. And it is clear that the student classification of II-S is lower than the classification of a conscientious objector, I-O. In 1966 the board therefore had no occasion to pass on the conscientious objector claim.

As respects the reclassification of registrant in 1967 the Chairman of the board testified: ". . . I recall that subsequently the young man finished his college or left college, I don't recall, and did not further merit a 2S deferment at which time, sir, based on nothing further in his file other than what we had already had in the file, we gave him a 1A classification. In doing that, sir, we again reviewed what appeared in the file." And the Chairman also testified: "He was no longer in school and we had no alternative but to classify him 1A."

But it is clear from the Chairman's own testimony that the classification of I-A granted in 1967 was based upon the supposition that the board had denied the conscientious objector claim in 1966, for the Chairman stated:

"Based on our previous determination that his request for conscientious objection status was denied,

we had no alternative at that time but to give him a 1A, which we did.

"Q. You didn't consider the conscientious objector claim again because it had been denied previously?

"A. Yes——"

And yet, as the Chairman also testified, the *board made no decision in 1966:*

> Mr. Lande [board Chairman]: "When Mr. Mc-Gee's return application came in asking for his deferment on the grounds of conscientious objector, sir, that was reviewed by me and read and carefully considered, as I consider all requests. As I stated before, it was my considered judgment upon concluding the reading of it and my consideration that he did not rate the deferment.

> .        .        .        .        .

> "Q. Mr. Lande, am I correct in understanding that the decision with respect to this conscientious objector application was made, then, by you and *not by the entire board?*

> "The Court: Are you talking now about the original receipt of the application?

> "Mr. Meyer [counsel for petitioner]: Yes, your Honor.

> "The Court: Or when they were told or learned that he no longer was in college?

> "Mr. Meyer: The original receipt.

> "The Court: He said, as I recall it, that that was his decision."

It is, with all due respect, I think, a clear miscarriage of justice to allow a man to be sent off to prison where there are at best only dubious grounds for saying that the board discharged its statutory duty of considering and passing upon the conscientious objector claim.

The question might not loom as important as it seems to be in this case if the claim itself were a transparent one.  But there is nothing on the face of the claim or in the record to detract from it.  The man was a theological student studying for the priesthood, and to send him off to prison on this record is either to sanction a form of administrative trickery or to allow the Selective Service board to act quite irresponsibly.

If there were a "lawless" act in this case, it was committed by the Selective Service Board.

It was the board that defaulted, not McGee.  Its duty under the Regulations was to *"receive and consider all information,* pertinent to the classification of a registrant, presented to it."  32 CFR § 1622.1 (c)  (italics added).  The board did not "consider" the claim.  Since the board did not "consider" the claim and reject it, but deferred decision on it in 1966 and then in 1967 said that the 1966 deferment was a decision on the merits, there was no way in which McGee could have made a timely appeal to the board.

This case, on the facts, is a much stronger one for dispensing with the need to exhaust administrative remedies than was *McKart* v. *United States,* 395 U. S. 185.  In *McKart* the registrant failed to appeal his classification of I–A where he had enjoyed a IV–A classification (sole surviving son status) until his mother died.  Then the board put him in I–A on the ground that the "family unit" had ceased to exist.  We excused exhaustion of remedies on the ground that only a question of law was involved.  We rationalized the result as follows:

> "In short, we simply do not think that the exhaustion doctrine contributes significantly to the fairly low number of registrants who decide to subject themselves to criminal prosecution for failure to submit to induction.  Accordingly, in the present

case, where there appears no significant interest to be served in having the System decide the issue before it reaches the courts, we do not believe that petitioner's failure to appeal his classification should foreclose all judicial review." *Id.*, at 200.

By like reasoning, we should conclude that cases where the local board does not "consider" the conscientious objector claim must be few and far between. Moreover, the term "consider" is a key part of a Regulation and just as much a question of law as the phrase in issue in *McKart*. Men should not go to prison because boards are either derelict or vindictive.

I would reverse this judgment of conviction.