**UNITED STATES of America ex rel. Edward Earl KEMPF, Petitioner,**

v.

**COMMANDING OFFICER OF the FORT DES MOINES EXAMINING AND ENTRANCE STATION, Respondent.**

**Civ. No. 11–384–C–2.**

United States District Court,
S. D. Iowa, C. D.

March 14, 1972.

Michael W. Fay, Cedar Rapids, Iowa, for petitioner.

Allan L. Donielson, U. S. Atty., Des Moines, Iowa, for respondent.

## MEMORANDUM AND ORDER

HANSON, District Judge.

Edward Earl Kempf, inducted into the Armed Forces of the United States on October 7, 1971, seeks his release from the custody of the Commanding Officer of the Fort Des Moines Examining and Entrance Station. The relief he seeks is in the form of habeas corpus and he bases his claim on 28 U.S.C., Section 2241 et seq. The case was heard by the Court on December 21, 1971.

Kempf claims that his induction was unlawful because he suffers from a disqualifying medical condition specified in the regulations promulgated under the Military Selective Service Act of 1967.

Specifically, he claims that he suffers from strabismus and diplopia, two defects of the eye. When these defects occur together, according to Selective Service regulations, a person is disqualified from service in the Armed Forces.

At trial, Kempf's Selective Service file, a record of Local Board 13-6 in Benton County, Iowa, was received into evidence. It reveals the following pertinent facts:

1. August 19, 1966. Kempf registered with Local Board 13-6 one day after his eighteenth birthday.

2. October 17, 1966 until June 1, 1970. Kempf was classified II-S as a full-time college student.

3. January 19, 1970. Kempf's local board advised Kempf that it would extend his II-S until December 1970, to enable him to complete his college education.

4. May 12, 1970. Kempf indicated in SSS Form 127 that he was cross-eyed and experienced double vision.

5. October 23, 1970. The local board classified Kempf II-S until December 1, 1970.

6. November 13, 1970. The local board ordered Kempf to report for his physical examination on December 7, 1970.

7. December 8, 1970. Kempf was found fully acceptable physically for induction into the Armed Forces.

8. December 29, 1970. The local board classified Kempf I-A.

9. January 29, 1971. The local board received a letter from Reid Motley, M. D., an ophthalmologist, stating that Kempf had large-angle esotropia with constant diplopia.

10. January 29, 1971. The local board received a letter from Kempf requesting an interview with the medical advisor to the board. He requested in the alternative that Dr. Motley's letter be submitted to and evaluated by the physicians at the Fort Des Moines entrance station.

11. February 1, 1971. The local board ordered Kempf to report for induction on February 16, 1971. In an accompanying letter the local board stated that it "had no choice but to order you [Kempf], since you were the next one eligible for induction." It further advised of the possibility that the state director would cancel the induction order. In a separate letter to the state director, the local board forwarded Kempf's file and requested the state director's review and advice.

12. March 3, 1971. State headquarters advised the local board that Kempf should receive an ophthalmic consultation.

13. March 4, 1971. Local board ordered Kempf to report for an ophthalmic consultation on March 10, 1971.

14. March 11, 1971. The Fort Des Moines examining station sent Kempf to Arthur F. Downing, M.D., an ophthalmologist, for examination. Dr. Downing was requested to examine Kempf's eyes for signs of diplopia and esotropia and to render a medical opinion on Kempf's visual fitness for military service. On the consultation report, Dr. Downing wrote: "Subjective diplopia (all diplopia subjective). Life long history of esotropia . . . . No subjective diplopia at angle of deviation (hooror fusionis). Suggest the matter of substantiated diplopia be referred to higher authority. This man is not incapacitated from ordinary activities."

15. March 12, 1971. The Fort Des Moines examining station advised Local Board 13-6 that Kempf was found fully acceptable physically for induction into the Armed Forces.

16. March 22, 1971. Kempf requested of the Office of the Surgeon General that it review his file.

17. April 23, 1971. The local board ordered Kempf to report for induction on May 11, 1971.

18. April 26, 1971. Kempf's local board ordered Kempf to report for a physical examination on May 3, 1971.

19. April 28, 1971. The local board received a request from Kempf that it postpone his induction until the Surgeon General's office reached its decision.

20. May 4, 1971. Dr. Downing again examined Kempf at the request of the Fort Des Moines examining center. The Fort Des Moines examining station requested that Dr. Downing run the red lens test for diplopia. Dr. Downing's report reads in part as follows: "Red lens test = 20 [prism diopters] esotropia. No fusion at 0 [prism diopters] deviation. *States* he has subjective double vision in all directions. Diagnosis: Concomitant esotropia of 20 [prism diopters]."

21. May 10, 1971. The local board postponed Kempf's induction upon the authority of state director until his acceptability had been determined.

22. May 11, 1971. The Surgeon General informed Kempf that he was "medically qualified under current medical fitness standards for induction into the Armed Forces." On the same date, the Fort Des Moines examining station advised the local board that Kempf was found fully acceptable physically for induction into the Armed Forces.

23. May 24, 1971. Kempf's local board ordered Kempf to report for induction on June 7, 1971.

24. June 8, 1971. Kempf presented two additional letters to the medical examiners at Fort Des Moines. One letter, dated June 5, 1971, is from C. A. Hendricks, M.D., an ophthalmologist; the other letter, dated June 7, 1971, is from L. N. Pipkin, O.D., an optometrist. Both letters assert that Kempf has esotropia and diplopia.

25. June 8, 1971. Kempf again was found to be medically qualified for service in the Armed Forces. Kempf then refused to submit to induction into the Armed Forces. In a signed statement he stated: "I am refusing to continue with being inducted on the grounds that I have 3 medical statements stating that I definitely have diplopia and that the Army's ophthalmologist does not agree to this."

26. July 13, 1971. Kempf was indicted by the United States Grand Jury for the Southern District of Iowa for failure to submit to induction into the Armed Forces.

27. October 7, 1971. Kempf submitted to induction into the Armed Forces.

28. October 8, 1971. Kempf brought this present action.

### I.

■ Kempf challenges the legality of his detention and custody in the Armed Forces. In order to be successful in this habeas corpus proceeding, he must show that his induction was unlawful. He must show that there was no basis in fact for the Selective Service System to classify him I-A and thus declare him eligible for induction. United States ex rel. Taylor v. Fritz, 446 F.2d 36, 37 (8th Cir. 1971).

The scope of this Court's review of Selective Service System determinations is set out in United States v. Watson, 442 F.2d 1273, 1277 (8th Cir. 1971):

> Decisions of local boards are final even though erroneous if they are made in conformity with the regulations. It is not for the courts to sit as super draft boards substituting their judgment on the weight of the evidence for that of the designated agencies. The scope of review is narrow, permitting the reviewing court to overturn a draft classification only if it has no basis in fact or if the local board's action has the effect of denying appellant basic procedural fairness.

With this very narrow scope of review in mind, the Court turns to the substantive issue.

Subsection 454(a) of Title 50 Appendix of the United States Code reads in part as follows:

> No person shall be inducted into the Armed Forces for training and service

. . . until his acceptability in all respects, including his physical and mental fitness, has been satisfactorily determined under standards prescribed by the Secretary of Defense . . . .

Part 1622 of Title 32 of the Code of Federal Regulations provides for the classification of registrants with physical disabilities which would prevent them from being classed I-A, eligible for induction. Class IV-F is for registrants who are not qualified for any military service; Class I-Y is for registrants who would be qualified for military service in time of war or national emergency.

■ A registrant's classification must be determined solely on the basis of official forms of the Selective Service System and other written information contained in his file. Oral information cannot be considered unless it is summarized in writing. 32 C.F.R., Section 1623.1(b). A registrant must be placed in the lowest class for which he is determined to be eligible. 32 C.F.R., Section 1623.2.

Army Regulation 40–501, Paragraph 2–12(h) (5) states that a cause for rejection for induction is strabismus in any degree accompanied by documented diplopia. It is uncontroverted that Kempf has esotropia, which is a form of strabismus. The controversy is over whether he has diplopia, or double vision.

Kempf was last classified by his local board on December 29, 1970, when he was placed in class I-A. Because he had been found physically fit for service just prior to that time, the board certainly had a basis in fact for its decision.

■ Evidence adduced in the hearing of this matter conclusively indicated, however, that the Fort Des Moines examining station has no personnel or equipment for determining whether registrants have defects of the eye such as strabismus or diplopia. Registrants are not tested for these conditions. The letter of Dr. Motley, received by the board on January 29, 1971, indicating that Kempf had esotropia and diplopia, created, therefore, a prima facie case for medical exemption.

■ Kempf requested that the local board set up a medical interview for him, or in the alternative, submit Dr. Motley's letter to the Fort Des Moines examining center for evaluation. It was clearly within the board's power to comply with either request. 32 C.F.R., Sections 1628.2, 13, 14(a) & (e). Instead, it notified Kempf on February 1, 1971, that it was powerless to do anything. This hardly can be considered good faith dealing with the registrant. Certainly, the local board was not acting in conformity with Selective Service System regulations.

Kempf, however, finally did receive some accommodation and was sent to Dr. Downing for an ophthalmic consultation. In his report of March 11, 1971, Dr. Downing acknowledged that Kempf had strabismus. He also indicated that Kempf had "subjective diplopia," acknowledging at the same time that no other kind of diplopia existed. Then Dr. Downing said, "Suggest the matter of substantiated diplopia be referred to higher authority." The only reasonable interpretation of this statement is that Dr. Downing was not sure what the regulation meant when it referred to "documented diplopia."

■ This Court has much less trouble with the term "documented." A condition is documented when it is verified in writing to exist by someone competent to determine its existence. Dr. Motley's letter was documentary evidence that Kempf had diplopia. See "Documentary Evidence," 13 Words & Phrases 182–84.

■■ Dr. Downing concluded his report by stating that Kempf was not incapacitated from ordinary activities. The Government urges that the spirit of the physical exemption regulations is best summarized by the phrase "incapacitated from ordinary activities." It urges that all specific physical debilities listed in the regulations should be modi-

fied or conditioned upon whether they incapacitate the registrant from ordinary activities. In support of its argument, the Government introduced at hearing a letter from the Director of Armed Forces Entrance and Examining Station Operations dated July 22, 1971. This letter deals with ophthalmologic evaluations at examining stations. With respect to diplopia it posits a standard of interpretation which would not exempt registrants who had adjusted to their condition to the extent that they could carry on normal activities. Of course, this interpretation was not promulgated when Dr. Downing examined Kempf. Furthermore, the communication purports to interpret only Army Regulation 40–501, Paragraph 2–12(h) (1). The communication does not interpret Paragraph 2–12(h) (5), the point of controversy in the instant case. There is little indication that this letter states the general policy the Government suggests. Finally, the regulations state that the Surgeon General sets the standards for physical exemption. 32 C.F.R., Section 1628.1. The Court can find no indication in the Surgeon's regulations that there exists an overall standard which would modify or condition the application of the specific standards for physical exemption the Surgeon has listed. Nowhere in the Army Regulations is it explicitly stated that a man must be "incapacitated from normal activities" before he can be physically exempt from service. And even if there were such a provision, the Court would have trouble holding that it controlled the specific regulation stating that a person is exempt if he has strabismus accompanied by documented diplopia, for the normal rule of statutory interpretation is that specific provisions control general provisions. Bulova Watch Co. v. United States, 365 U.S. 753, 81 S.Ct. 864, 6 L. Ed.2d 72 (1961); United States v. West View Grain Co., 189 F.Supp. 482 (N.D. Iowa 1960). The Surgeon has promulgated a regulation stating that a cause for rejection for induction is strabismus of any degree accompanied by document-

ed diplopia. Until the Surgeon changes this regulation it is the law of the land and must be applied by medical examiners, draft boards, and courts. No person or body, except one who has the power to change the regulation legislatively, can ignore this regulation.

■ Kempf had strabismus according to Dr. Downing. Dr. Downing had before him documentary evidence that Kempf had diplopia. Dr. Downing did not state that Kempf did not have diplopia; rather he questioned what the term "documented diplopia" meant. That Dr. Downing found Kempf not incapacitated from normal activities is irrelevant, for Army Regulation 40–501, Paragraph 2–12(h) (1) does not require this, in contrast to Paragraph 2–12(h) (1) which may require such a finding. The Court can find, therefore, no basis in fact for the Fort Des Moines examining station's finding of March 12, 1971, that Kempf was fully acceptable physically for induction.

Dr. Downing's report of May 4, 1971, provides no basis in fact for denying a physical exemption. This report merely reiterates what he said earlier. Thus, the examining station again had no basis in fact for telling the local board that Kempf was fully acceptable for induction on May 11, 1971. In addition, the Surgeon General had no basis in fact for finding Kempf medically qualified on May 11, 1971. The only Army doctor to examine Kempf for ophthalmologic problems was Dr. Downing, a civilian on contract with the Army. Thus, the Surgeon had uncontroverted evidence before him that Kempf had strabismus and documented diplopia. An administrative agency cannot ignore its own regulations. United States v. Chaudron, 425 F.2d 605 (8th Cir. 1970); Briggs v. United States, 397 F.2d 370 (9th Cir. 1968). The Surgeon was precluded from denying that Kempf was physically disqualified from service.

■ A finding by the examining station that a registrant is physically qualified for service is binding upon the local

board. 32 C.F.R., Section 1628.25. Technically, then, the local board would have a basis in fact denying a claim for physical exemption because the examining station found Kempf physically qualified. Since the local board had no discretion to question the medical determination, the Court must look behind the local board's finding to the findings of the Army medical examiners. The Fort Des Moines examining station and the Surgeon General had no basis in fact for finding Kempf physically qualified.

## II.

Even if the Court could find that technically the local board had a basis in fact for its determination that Kempf should be in Class I-A, the Court could not hold that due process of law was granted Kempf. At the hearing on this matter, Dr. Downing testified that he ignored and did not apply Army Regulation 40–501, Paragraph 2–12(h) (5) because he did not understand what it meant when it referred to "documented diplopia." There is no indication from Kempf's file that this regulation was ever explained to Dr. Downing by any Army medical examining personnel. There is every indication that all of the Army medical examiners, from the Fort Des Moines examiners to Dr. Downing to the Surgeon General, ignored the regulation, because the record before them was at all times uncontroverted that Kempf had esotropia accompanied by documented diplopia.

In order for a procedural error, such as the disregard of regulations evidenced in this case, to be sufficient to invalidate an induction order, it must be of a magnitude to have caused substantial prejudice to the registrant. The burden is upon the registrant to show the prejudicial effect. United States v. Chaudron, 425 F.2d 605, 608 (8th Cir. 1970). Here, Kempf has clearly shown substantial harm: he has made a prima facie showing that his physical condition falls within the terms of the regulation ignored. United States v.

Silver, 331 F.Supp. 415, 416–417 (D. Minn.1971).

## III.

The Government has moved to dismiss Kempf's petition, asserting that the matter of physical examination is a determination made by the military and is not subject to review. The Court notices that there are several federal cases containing language to the effect that courts are not permitted to inquire into a registrant's physical fitness or into decisions of Army medical examiners and that a letter of a private physician contrary to the Army's findings is not enough to trigger court inquiry. E. g., United States v. Sowul, 447 F.2d 1103 (9th Cir. 1971); United States v. Shunk, 438 F.2d 1204 (9th Cir. 1971); United States v. Haifley, 432 F.2d 1064 (10th Cir. 1970); Byrne v. Resor, 412 F.2d 774 (3d Cir. 1969). Insofar as these decisions deal with inquiry into discretionary judgments made by Army medical examiners, this Court agrees with them. It has long been held that federal courts cannot review the discretionary judgment of a military officer made within the scope of his authority. Orloff v. Willoughby, 345 U.S. 83, 73 S. Ct. 534, 97 L.Ed. 842 (1953). Thus, if the question before the Court was whether Kempf had strabismus, the Court would be compelled to defer to the judgment of the Army medical examiners, at least if there was a basis in fact for that decision. See United States v. Hansen, 327 F.Supp. 1090 (D.Minn. 1971). Of course, the medical examiners indicate that Kempf has strabismus. The issue, then, is whether Kempf has "documented diplopia." This is not a pure medical question. Rather, it is a legal question, since the term documented is a legal, not a medical, term. The Court knows of no case holding that a federal court must defer to the judgment of the Selective Service System or the Army's medical examiners when the issue involved is a legal issue. The law is clearly to the contrary. See Welsh v. United States, 398 U.S. 333, 90 S.Ct.

1792, 26 L.Ed.2d 308 (1970)`; Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953). Dr. Motley's letter made out a prima facie case that *Kempf had documented diplopia.* Neither the local board, the medical examiners, nor the Surgeon General have indicated in Kempf's file that Kempf or Dr. Motley were in bad faith. Thus, this Court is fully warranted in holding as a matter of law that Kempf had documented diplopia. See Mulloy v. United States, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970); Dickinson v. United States, 346 U.S. 389, 74 S.Ct. 152, 98 L.Ed. 132 (1953).

### IV.

In its Motion to Dismiss and its other pleadings, the Government has called to the Court's attention United States ex rel. Taylor v. Fritz, 446 F.2d 36 (8th Cir. 1971). The Eighth Circuit held that Taylor had failed to exhaust his administrative remedies, and, therefore, was precluded from attacking his induction order via habeas corpus. On its face, *Taylor* seems to be closely analogous factually to this present case. A close examination of the findings of fact by the district court, however, shows crucial variances between that case and the case at bar. 323 F.Supp. 673 (S.D. Iowa 1971).

The pertinent facts in *Taylor* are: Taylor was found physically unacceptable by the entrance station because he failed the hearing tests. He was classified I-Y by his board. Approximately one year later Taylor was re-examined and this time he passed the hearing test; the examining station reported that he was fully acceptable. Approximately three weeks later Taylor wrote a letter to Senator Harold E. Hughes complaining of the examining procedure. Shortly thereafter Taylor was classified I-A and was advised of his rights to appeal and to personal appearance. Taylor did not appeal; nor did he request a personal appearance; nor did he request a medical interview. Judge Stephenson concludes: "[I]n short, Taylor's posturing did nothing to clearly put his position before the Local Board whose action he is now attacking." 323 F.Supp. at 678. The only affirmative action Taylor took to obtain review of his classification was to write to the Surgeon General approximately three months after he was classified I-A. The Eighth Circuit held that this case was not a proper procedure for review. 446 F.2d at 37.

Kempf's factual situation is much different. Kempf presented Dr. Motley's letter after he had been classified I-A.[1] He also took immediate affirmative action to place his claim before the board by requesting a medical interview or, in the alternative, submission of Dr. Motley's letter to the Fort Des Moines examining station.[2] Kempf did not appeal his classification, but the Court can hardly say that Kempf was sitting on his hands because he did not appeal. It is not apparent from the regulations that an appeal was the only proper method to present his claim to the board. Rather, a perusal of the regulations would strongly suggest that Kempf's course of action was the proper method.

---

1. There is no problem here of undue delay in presenting the information concerning the eye problem even though Kempf had been registered with the local board for over four years. At all times previous Kempf had been a full time college student and was classified II-S. Since II-S is a lower classification than I-Y, a class for those deferred for medical reasons, and since a registrant is to be placed in the lowest class in which he qualifies, Kempf was not required to give his local board data concerning his physical problems until his II-S had expired. United States v. Abbott, 425 F.2d 910 (8th Cir. 1970).

2. Dr. Motley's letter made a prima facie case for physical exemption. The Court notes, without deciding, that Kempf may have been denied due process by the board's failure to reopen his classification upon receiving the letter. See Mulloy v. United States, 398 U.S. 410, 90 S.Ct. 1766, 26 L.Ed.2d 362 (1970).

The Eighth Circuit, in deciding that Taylor had not exhausted his administrative remedies, relied upon McGee v. United States, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971). *McGee* in turn is a further exposition of the exhaustion doctrine announced in McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). *McGee* and *McKart* state that "the task for the courts, in deciding the applicability of the exhaustion doctrine to the circumstances of a particular case, is to ask 'whether allowing all similarly situated registrants to bypass [the administrative avenue in question] would seriously impair the Selective Service System's ability to perform its functions.'" 402 U.S. at 484, 91 S.Ct. at 1568; 395 U.S. at 197, 89 S.Ct. at 1665. *McGee* further summarizes the exhaustion doctrine expostulated in *McKart*:

> *McKart* specified the salient interests that may be jeopardized by a registrant's failure to pursue administrative remedies. Certain failures to exhaust may deny the administrative system important opportunities "to make a factual record" for purposes of classification, or "to exercise its discretion or apply its expertise" in the course of decision-making. [395 U.S.] *Id.*, at 194 [89 S.Ct. 1657 at 1663]. There may be a danger that relaxation of exhaustion requirements, in certain circumstances, would induce "frequent and deliberate flouting of administrative processes," thereby undermining the scheme of decision-making that Congress has created. *Id.*, at 195 [89 S.Ct. 1657, at 1663]. And of course, a strict exhaustion requirement tends to ensure that the agency have additional opportunities "to discover and correct its own errors," and thus may help to obviate all occasion for judicial review. *Ibid.* To be weighed against the interests in exhaustion is the harsh impact of the doctrine when it is invoked to bar any judicial review of a registrant's claims. Surely an insubstantial proce-

dural default by a registrant should not shield an invalid order from judicial correction, simply because the interest in time-saving self-correction by the agency is involved. That single interest is conceivably slighted by any failure to exhaust, however innocuous the bypass in other respects, and *McKart* recognizes that the exhaustion requirement is not to be applied "blindly in every case." *Id.*, at 201 [89 S.Ct. 1657, at 1666]. *McKart* also acknowledges that the fear of "frequent and deliberate flouting" can easily be overblown, since in the normal case a registrant would be "foolhardy" indeed to withhold a valid claim from administrative scrutiny. *Id.*, at 200 [89 S.Ct. 1657, at 1666]. Thus the contention that the rigors of the exhaustion doctrine should be relaxed is not to be met by mechanical recitation of the broad interests usually served by the doctrine but rather should be assessed in light of a discrete analysis of the particular default in question, to see whether there is "a governmental interest compelling enough" to justify the forfeiting of judicial review. *Id.*, at 197 [89 S.Ct. 1657, at 1665].

The question before the Court is whether Kempf's failure to appeal is a failure to exhaust administrative remedies which, within the contemplation of *McKart* and *McGee*, would preclude Kempf from challenging his induction order in this proceeding. The failure to appeal certainly did not prevent the Selective Service System from making an adequate factual record. The Court cannot conceive of any factual record the appeal board could make in this case, for its function merely is to review the information contained in the registrant's file. 32 C.F.R. Section 1626.24. Had an appeal been taken by Kempf, the appeal board could not have applied its expertise in reviewing Kempf's file, for the regulations dictate that when the record is irregular, such as it would have been in this case, the appeal board must re-

turn the file to the local board for appropriate corrective action. 32 C.F.R. Section 1626.23.

Furthermore, this Court does not deem the relaxation of the exhaustion requirement in the instant case to be any inducement for frequent and deliberate floutings of the Selective Service System administrative process. The failure of Kempf to appeal in this instance is quite obviously not the result of any mendacity or even negligence on the part of Kempf. Kempf believed he was pursuing the right course in asking for a medical interview or review by the examining station; indeed, he did so on the advice of counsel. The Court repeats its observation here that the regulations are certainly ambivalent on what is the correct procedure in this situation.

Finally, the Court is not at all certain the Selective Service System would have had any additional opportunity to discover and correct its own errors, had Kempf appealed to the appeal board. The appeal board classifies registrants, "giving consideration to the various classes in the same manner in which the local board gives consideration thereto when it classifies a registrant." 32 C. F.R. Section 1626.26. A finding by the examining station that a registrant is physically qualified for service is binding upon the local board. 32 C.F.R. Section 1628.25. It would seem to follow, then, that the finding of the examining station would be binding upon the appeal board also.

In summary, there appears to be no good reason for this Court to invoke the exhaustion requirement, as articulated by *McGee* and *McKart,* against Kempf. In *Taylor,* where the Eighth Circuit invoked the exhaustion requirement, the failure to pursue proper remedies was much more egregious than in this instant case. Taylor's failure to pursue proper administrative channels did work to the detriment of intelligent and efficient Selective Service System determination of his claim, creating a situation in which *McGee* and *McKart* dictate that

the judicial remedy then be foreclosed. Kempf's failure to appeal did not work to the detriment of proper administrative determination. Therefore, the writ must be granted for reasons stated previously in this Memorandum.