**UNITED STATES of America,**

v.

**Vincent Francis McGEE, Jr., Defendant.**

**No. 68 Cr. 186.**

United States District Court, S. D. New York.

May 5, 1972.

Peter Truebner, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the S. D. N. Y., and John W. Nields, Jr., Asst. U. S. Atty., New York City, of counsel), for plaintiff.

Alan H. Levine, New York City (Leon Friedman, New York City, and New York Civil Liberties Union, of counsel), for defendant.

## MEMORANDUM

MURPHY, District Judge.

Chief Judge Friendly characterized the appeal from our order denying defendant's motion for a reduction of sentence under Rule 35 as "an *epilogue* to the proceedings detailed in the previous opinions of this court and the Supreme Court" (emphasis supplied). McGee v. United States, 462 F.2d 243 (2d Cir. 1972). With due deference, we would suggest that instead of the fall of the curtain, it is a prologue to a modern Jarndyce v. Jarndyce.

The Court of Appeals determined that it was not improbable in this particular case that "the initial sentencing process with respect to the valid counts was to some extent affected by the conviction on the far more serious count 1, which was illegally brought." Accordingly, it vacated the order and remanded, "to purge this possible taint after the fact on a Rule 35 motion, we believe the trial judge should either have reduced the sentences on counts 2 through 4 or have given at least a summary explanation of his reasons for declining to do so, *cf.*, North Carolina v. Pearce, 395 U.S. 711, 725–726, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969)."

We respectfully submit there is no comparison in *McGee's* case to North Carolina v. Pearce. There was no successful appeal. There was no retrial. There was no increase in the sentence. There is not one scintilla of evidence in the record or even an argument in appellant's brief that we were vindictive.

We must first digress to call attention to some inadvertent statements in the majority opinion of the court, since they cast a shadow on our judgment where none exists. Whether Count 1 was "most serious" or "far more serious", as the majority opinion repeated three times—the undeniable fact remains that the Congress has determined that all are equally serious, since it fixed a five-year sentence and a $10,000 fine for the maximum punishment as to each.

Again, the court characterized the two-year concurrent sentence we imposed as *severe* in the opinion of the Government (see fn. 6). This, too, must be inadvertent error, since nowhere in the Government's brief is there such a characterization. Obviously the sentence is mathematically lenient if it is mensurative by what Congress has authorized.

The Court of Appeals attaches some importance to a manual entitled "Legal Aspects of Selective Service, 47 (1969)", which neither the court nor the appellant actually saw fit to quote. For pur-

poses of completeness and accuracy, we attach as an Appendix hereto the entire reference.

But accuracy aside, what relevancy a manual issued by the Selective Service System has to do with the actions of a district court in a prosecution that was instituted on February 29, 1968 and tried to a jury in November 1968, escapes us. Fn. 4 in the majority opinion creates the impression that such a manual was something the Department of Justice was privy to. We think it would be agreed that the Selective Service System is an independent agency of the Executive Department.

Reference is made by the Court of Appeals to the large number of flattering letters from people in all walks of life commending McGee for his opinions and work, both prior to and subsequent to the trial, as a factor that should be considered by us in reducing his sentence. At the time of the original sentence the probation report indicated that aside from the charges in the indictment on which he was convicted and a pending indictment for burning his registration and classification certificates, McGee did enjoy a good reputation. We examined it again on the Rule 35 motion. We were never too much impressed with these encomiums, the same as juries over many years have not been too much impressed by character witnesses. During the trial we always had a serious doubt about McGee's intention to become an ordained Catholic priest. Cf., United States v. McGee, 2d Cir., 426 F.2d 691, 696 and fn. 5. It was first engendered when he was asked on cross-examination whether he had been incardinated by the bishop to attend the Union Theological Seminary. The questions and answers were:

"Q. Mr. McGee, you testified that you are a candidate for the priesthood, is that correct?

"A. Yes.

"Q. Would you tell us, Mr. McGee, what incardination is?

"A. That is nothing—it is not my understanding that that has anything to do with candidacy for the priesthood.

. "Q. I didn't ask you that. I asked you if you would tell us what incardination is.

"A. That is nothing—it is not my understanding that that has anything to do with candidacy for the priesthood.

"Q. I didn't ask you that. I asked you if you would tell us what incardination was.

"A. A person who is being ordained is accepted by the bishop to act as a priest in his diocese.

"Q. Have you been so sponsored by a bishop, Mr. McGee?

"A. It has nothing to do with me.

"Q. I asked you whether you have been so sponsored by a bishop.

"A. It has nothing to do with my status. I have not."

Later we noted at the time of the Rule 35 motion that one of the witnesses at the trial, a Father Ford, was a writer of one of the many letters. He stated that he officiated at McGee's marriage in April 1971 after a long engagement. But we gave him the benefit of the doubt. Perhaps he was like Saul, on his way to Damascus, and changed his plan of life.

We are not alone in having the heavy responsibility of sentencing people to jail who, save for the crime proved to the satisfaction of a jury, had always been good and responsible people, at least in the opinion of those who knew them. The late Mr. Indiviglio, who has attached his name to a case frequently cited (United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (en banc), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L. Ed.2d 663 (1966), was an ordained minister according to the testimony of his bishop at the time I sentenced him for bail jumping. Doctors, lawyers, accountants, and a host of others that I

sentenced in the space of 21 years also had good reputations. In fact, I remember a district judge sentencing a judge of the Court of Appeals to jail for two years.

What troubles us most is the direction to share in the appellate court's belief that the sentence should be reduced or, as a minimum standard, to give at least a summary explanation of our reasons for declining so to do.

Assuming that this Court still has jurisdiction under Rule 35 to reduce the sentence, and admittedly there is some good authority to that effect, we have some abiding doubts. We are satisfied that the 120-day period provided by the Rule is jurisdictional (see 8A Moore's Federal Practice, ¶ 35.02[2]). The 120 days have long since expired, since the Supreme Court affirmed McGee's conviction on May 17, 1971.

In any event, we would not reduce the sentence by one day no matter what the "belief" of the Court of Appeals is. The sentence is within the statutory limit and, as Judge Timbers said so cogently, "It is none of our appellate business."

All of this aside, herewith is our *apologia* for declining to homologate the court's belief (direction ?) that we should reduce the sentences on Counts 2 through 4.

The reasons we did not reduce the sentences on those counts were: they were, in the judgment of the Congress and in ours, equally serious crimes; they were each committed at different times than Count 1 and with each other, to wit: Count 1, January 29, 1968, Count 2, October 18, 1968, Count 3, September 20, 1967, Count 4, July 3, 1967; in sum, each showed an uncompromising attitude and a callous disregard ("stiff-necked", as the Court of Appeals described his conduct) of a law that he did not approve and a desire to take the consequences as a martyr. In fact, his counsel, in summation to the jury, likened him to Martin Luther, all of this *contra* to the many thousands of young men who, unhappily but conscientiously, fulfill their obligations as citizens. In addition, we were influenced by Mr. Justice Marshall's analysis in affirming the conviction wherein he stated:

> "It remains that McGee's failure to pursue his administrative remedies was deliberate and without excuse. And it is not fanciful to think that 'frequent and deliberate flouting of the administrative process' might occur if McGee and others similarly situated were allowed to press their claims in court despite a dual failure to exhaust." 402 U.S. 479, 491, 91 S. Ct. 1565, 1572, 29 L.Ed.2d 47.

As a famous Irishman said in concluding his allocution before he was condemned to death, "I have done."

## APPENDIX

### V. Delinquents

**55. Delinquents in General.** Selective Service Regulations are designed to delay the prosecution of a violator of the law until after he has failed to report for or refused to submit to induction or assigned civilian work.[64] This is to prevent, wherever possible, prosecutions for minor infractions of rules during his selective service processing, thereby reducing the number of cases that reach the courts and also giving the registrant, before being prosecuted, an opportunity to report for service in the armed forces. Since the purpose of the law is to provide men for the military establishment rather than for the penitentiaries, it would seem that when a registrant is willing to be inducted, he should not be prosecuted for minor offenses committed during his processing. The result of this procedure is that the great majority of prosecutions involve the failure to report for or refusal to submit to induction or assigned civilian work.

The only other offense which is prosecuted with some frequency is failure to register. These prosecutions almost always end with the defendants submitting to registration and only in rare instances does the court prepare an opinion. There is virtually no defense to a

charge of failure to register if the defendant in fact has not registered and is not in a group which has been relieved from liability for registration, since even the regulation which requires a registrar to sign the registration form when the person to be registered refuses presupposes that such person will present himself for and submit to registration.[65] It is not the obligation of selective service authorities to go out and secure the necessary information.[66]

In addition to failure to register and failure to report for or refusal to submit to induction or assignment to civilian work, the courts have had occasion to consider other offenses such as the making of a false statement regarding liability or nonliability for military service,[67] counseling, aiding, and abetting another to refuse or evade registration or service,[68] failure to perform reserve obligations under the Law,[69] failure by a registrant to keep his board advised of a change of address,[70] and burning or otherwise destroying draft cards.[71]

The escalation of the United States military involvement in Vietnam increased the draft calls, and there was an upsurge of public demonstrations in protest. Some of these protests took the form of turning "draft" cards in to various public officials of the Department of Justice, the State or National Headquarters of Selective Service System, or directly to local boards. By agreement with the Department of Justice, registrants who turned in cards (as contrasted to those who burned cards) were not prosecuted under section 12(a) of the Military Selective Service Law of 1967, but were processed administratively by the local boards. In many instances, the local boards determined that a deferment of such registrant was no longer in the national interest, and he was reclassified I–A delinquent for failure to perform a duty required of him under the Act, namely retaining in his possession the Registration Card and current Notice of Classification card. Many of these registrants were inducted, others were convicted for refusing induction,[72]

and others filed injunction suits against the System in an attempt to halt this processing.[73] As this publication goes to press, the questions of injunction suits and constitutionality of the delinquency regulations are pending before the United States Supreme Court.[74]