UNITED STATES of America

v.

Allan Aaron SHAPIRO, Defendant.

No. 67 Cr. 621.

United States District Court,
S. D. New York.

June 25, 1975.

Paul J. Curran, U. S. Atty., New York City, by George E. Wilson, Asst. U. S. Atty., for plaintiff.

Kunstler, Kunstler, Hyman & Goldberg, by Joan E. Goldberg, New York City, for defendant.

ROBERT L. CARTER, District Judge.

### OPINION

In July, 1967, defendant Allan Aaron Shapiro was indicted for refusal to submit to induction, in violation of 50 U.S. C. App. § 460(a). In January, 1968, he fled the United States and has remained outside the jurisdiction of the court to this day. Defendant moved to dismiss the indictment in November, 1974. The government declined to answer Shapiro's motion on the merits while defendant remained a fugitive. In an opinion dated March 24, 1975, it was held that the merits of Shapiro's motion would be decided without requiring him to surrender, and the government was directed to respond on the merits. *See* 391 F.Supp. 689. The government has now done so.

Defendant's motion to dismiss is grounded solely on the claim that his local Selective Service board failed to state any reason for its denial of his application for a conscientious objector exemption. The government contends that Shapiro is precluded from raising this defense because he did not perfect an appeal from the local board's ruling and therefore failed to exhaust administrative remedies. Alternatively, the government argues that the board was not required to give any reason for its action because Shapiro's application did not make a *prima facie* case for conscientious objector classification. Finally, the government contends that even if Shapiro did make a *prima facie* case for exemption, the board gave an adequate statement of its reasons.

The following facts appear to be substantially undisputed.[1] Defendant regis-

---

1. The principal source of evidence is defendant's Selective Service file. The government has filed copies of documents and correspondence taken directly from the file. Shapiro

tered under the Selective Service System in 1962 when he was 18 years old. He was classified 2–S as a full-time student. By letter dated December 1, 1965, his local board asked him to confirm that he was still attending City College. The following day, he replied that he was currently enrolled, but that he expected to take a leave of absence shortly and would not return before the spring term of 1966. On December 13, 1965, the board voted 3–0 to classify Shapiro 1–A, available for induction, and the following day SSS Form 110 was sent to Shapiro notifying him of his classification and his right to appeal. On December 21, 1965, the board received a letter from Shapiro requesting a personal appearance. The board did not acknowledge his request, and on January 8, 1966, Shapiro wrote to the board noting this, and requesting SSS Form 150, the application for conscientious objector classification.

On January 17, 1966, the local board sent Shapiro SSS Form 150, indicating on the form that it was to be completed and returned in one week. On January 24, 1966, Shapiro personally submitted his application at the headquarters of the local board,[2] but he was informed that a personal appearance scheduled for that day had been postponed. On February 7, he was notified that his personal appearance was scheduled for February 14, 1966. On February 13, Shapiro wrote to the board, setting forth "the salient points" of his objection to the

Vietnamese war; but this letter was not received until February 15.[3] Shapiro made a personal appearance before the board on February 14, and a summary of his appearance was prepared by Mr. Jack P. Daniels, chairman of the local board. (Exhibit 5C).

On February 15, 1966, Form 110 was sent to defendant notifying him of the board's vote again classifying him 1–A, and of his right to appeal. Shapiro waited more than a month to respond, but on March 22, 1966, he wrote saying that he had taken more than the ten days allowed for the appeal "in order to think on what should be my future action." He stated in this letter that at his previous hearing, members of the board had suggested that he wait for his physical where he might be rejected on the recommendation of his therapist. He refused to take this suggestion, and requested an additional personal appearance. On April 18, 1966, Shapiro again made a personal appearance. A summary prepared by Daniels stated:

"Reg. in again. Appeal procedure explained. No basis for change as no change from February '66 presentation. To give reg. appeal right class 1A again and mail out card." (Exhibit 8A).

On April 22, 1966, Form 110 was sent to Shapiro, notifying him again of his 1–A classification and of his right to appeal within ten days. Shapiro did not appeal by May 2, but on June 6, 1966, the local

has submitted copies of what appear to be his own carbon copies of correspondence sent to the local board. With one exception, noted below, the government apparently does not dispute that the originals of all copies submitted by defendant on this motion are to be found in defendant's Selective Service file.

2. The affidavit of Shapiro's attorney states that he mailed SSS Form 150 to the board on February 13, 1966, together with a letter dated that day setting forth "the salient points" of his objection to the Vietnamese War. The court is apparently expected to consider the statements in the letter as merely a part of a more comprehensive statement of Shapiro's beliefs in the applica-

tion. However, the minutes of the local board's actions (Exhibit 1A–1) , and the application itself, which is stamped "January 24, 1966" clearly indicate that the application was submitted on January 24. The letter was sent separately on February 13.

3. The government claims that pages 2 and 3 of defendant's Exhibit 6, which defendant's attorney asserts was submitted on February 13, was never received by the board. These pages are evidently defendant's carbons of an attachment to his application and notes for his application. They conform substantially to the version actually submitted by defendant.

board wrote advising him that an appointment had been made for him with a government appeal agent for June 14, 1966. On June 8, 1966, Shapiro replied, saying that he had been informed by Daniels during his last appearance (April 18) that he would have to appeal within ten days following notice of classification. He continued as follows:

> "Taking Mr. Daniel's [sic] advice—that an appeal was futile since there was no law providing deferrment [sic] under these circumstances—I chose to relinquish my right to appeal. If, however, some quirk in my case requires an appearance before the Government Appeal Agent, I shall be glad to comply, although I *cannot* appear on the date set in your letter. I would request delaying the appeal one week, when my hours at work will be more flexible." (Emphasis in original). (Exhibit 11).

On June 10, 1966, the board wrote back as follows:

> "Receipt is acknowledged of your letter of June 8th, 1966. Is [sic] you wish to relinquish your right of an appeal, we must have this statement in writing by return mail." (Exhibit 12).

Shapiro responded on June 15, 1966, saying: "I'm afraid I don't quite understand what is happening." He then continued:

> "I have received the classification notice; I have not written an appeal letter. All of a sudden I received a letter stating my appointment before the Appeal Board. I then wrote, stating that I had not requested this appointment and asking for an explanation; instead of an explanation, I have received your letter of 10 June, asking that I specifically relinquish my right of appeal.

> "I am now explicitly requesting an explanation of the Board's behavior, an explanation of why I must *specifically* relinquish my right of appeal and

what this will mean." (Emphasis in original). (Exhibit 13).

Letters evidently crossed, and on June 15, without receiving Shapiro's letter of that date, the board wrote that a second appointment with the government appeal agent had been made for June 28, 1966. Shapiro's letter of June 17 stated that the board had not given the explanation he had requested; the letter continued:

> "I expect an explanation of the board's action; then, *if it is necessary, I shall make arrangements to be available for an appointment with the Government Appeal Agent.* As of now, I shall be working, Tuesday, 28 June, 1966, at 3:45 and will not be able to make this appointment." (Emphasis added). (Exhibit 15).

Despite Shapiro's statement that he would be available for an appointment with the appeal agent if necessary, on June 20, Daniels, the chairman of the local board, informed Shapiro that he need not appear before the government appeal agent because of his claimed relinquishment of his right of appeal:

> "This is in reference to your letters of June 8th and 17th. There will be no need for you to appear before the Government Appeal Agent. This is based on your statement that you were relinquishing your right to appeal.

> "We regret any inconvenience our letters inviting you to see the Appeal Agent may have caused you." (Exhibit 16).

On June 23, 1966, Shapiro wrote stating that contrary to Daniels' statement in his June 20th letter, he had never relinquished his appeal right:

> "It appears that this matter of relinquishing the right to appeal, will never be clarified. As far as I am concerned, I have not requested an appearance with the Government Appeal agent *and I have not made any statement that I would relinquish this right."* (Emphasis added). Exhibit 17).

The previous day, however, the board had sent Shapiro Form 223, his pre-induction notice to report for his physical on July 7. Some eight months later, on March 21, 1967, a notice of acceptability was sent to Shapiro, and in April, 1967, he retained his present counsel, Joan Goldberg, Esq. Ms. Goldberg "suggested to the Local Board that defendant be permitted to appeal the denial of his CO application." (Affidavit of Joan Goldberg, sworn to February 24, 1975, ¶ 16). The Legal Division informed the board that since Shapiro had knowingly allowed the ten-day appeal period following the April 22 notice to lapse, no procedural rights had been denied him.

On May 24, 1967, defendant was ordered to report for induction. After obtaining one postponement, he appeared on June 27, 1967, but refused to take one step forward when his name was called for induction. He was arrested the following day, and his indictment followed.

## I.

The standard to be applied to determine whether a Selective Service registrant has exhausted his administrative remedies was laid down in *McKart v. United States*, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). In *McKart*, the Supreme Court explained that in the context of a criminal prosecution, the term "exhaustion" does not refer to a "premature resort to the courts," since administrative remedies are closed to the defendant when the issue arises. Rather, in a Selective Service prosecution, the government asserts the registrant's previous failure to exhaust administrative remedies in order to preclude him from raising certain defenses:[4]

"We are asked instead to hold that petitioner's failure to utilize a particular administrative process—an appeal—bars him from defending a criminal prosecution on grounds which could have been raised on that appeal." 395 U.S. at 197, 89 S.Ct. at 1664.

In *McKart*, where the exhaustion doctrine was held not to bar consideration of the registrant's defenses even though he had sought neither a personal appearance nor an appeal, the Court stated that the doctrine can be "exceedingly harsh":

" * * * [I]t is well to remember that use of the exhaustion doctrine in criminal cases can be exceedingly harsh. The defendant is often stripped of his only defense; he must go to jail without having any judicial review of an assertedly invalid order." 395 U.S. at 197, 89 S.Ct. at 1664.

Moreover, it is fundamental that judicial review should rarely be denied where the individual is not seeking affirmative assistance from the government, but is resisting the government's attempts to impose sanctions on him. Hart and Wechsler, "Further Note on the Power of Congress to Limit the Jurisdiction of Federal Courts: an Exercise in Dialectic," *The Federal Courts and the Federal System*, 312, 318–28 (1953 ed.). In *McKart*, the Court said:

"The deprivation of judicial review comes not when the affected person is affirmatively asking for assistance from the courts but when the Government is attempting to impose criminal sanctions on him. Such a result should not be tolerated unless the interests underlying the exhaustion rule clearly outweigh the severe burden imposed upon the registrant if he is denied judicial review. (footnote omitted)" 395 U.S. at 197, 89 S.Ct. at 1664.

---

4. Indeed, with some exceptions, there can be no judicial review of administrative action by the Selective Service board until the registrant is prosecuted for refusal to submit to induction or until he petitions for habeas corpus after submitting to induction. McKart v. United States, *supra*, 395 U.S. at 196, 89 S.Ct. 1657; Witmer v. United States, 348 U.S. 375, 75 S.Ct. 392, 99 L.Ed. 428 (1955).

**1064**

The Court held that the test is "whether there is \* \* \* a governmental interest compelling enough to outweigh the severe burden placed on [the defendant]" by the denial of judicial review. *Id.* It specified three governmental interests which must be weighed in the balance: (a) the Selective Service agency's interest in having an opportunity to make a factual record and exercise its discretion and expertise; (b) the agency's interest in discouraging frequent and deliberate flouting of the administrative process; and (c) the agency's interest in correcting its own mistakes and thereby obviating unnecessary judicial proceedings. *See also United States v. Newmann,* 478 F. 2d 829, 831 (8th Cir. 1973).

**A.**

Unlike the defendant's application for exemption in *McKart,* which raised only issues of statutory interpretation,[5] Shapiro's application for conscientious objector classification in the instant case required an analysis of facts and an application of the agency's expertise. *McKart v. United States, supra,* 395 U.S. at 198 n. 16, 89 S.Ct. 1657; *McGee v. United States,* 402 U.S. 479, 486, 91 S. Ct. 1565, 29 L.Ed.2d 47 (1971). Thus the court must determine whether Shapiro provided sufficient factual detail to the agency to enable it to apply its expertise and exercise its discretion before the administrative proceedings were terminated. *See United States v. Holby,* 477 F.2d 649 (2d Cir. 1973); *United States v. Rabe,* 466 F.2d 783, 787 (7th Cir. 1972).

In the present case, Shapiro provided a full and detailed statement of his beliefs in his application for conscientious objector classification and in two subsequent letters dated February 13, 1966, and March 22, 1966. He also discussed his application with members of his local board during two personal appearances on February 14, 1966, and April 18, 1966.[6] He gave the names and addresses of two witnesses in support of his application, but the agency minutes do not show that the local board ever interviewed or otherwise sought information from them. It appears that the agency had "more than ample opportunity in this case to 'make a factual record.'" *United States v. Rabe, supra,* 466 F.2d at 787.

This case is distinguishable from *McGee v. United States, supra,* where the Supreme Court held that the defendant had failed to exhaust his remedies in part on the ground that "[he] made no effort to invoke administrative processes for factfinding." 402 U.S. at 486, 91 S. Ct. at 1570. There the defendant neither sought a personal appearance nor appealed, and returned all requests for information unanswered.

In summary, in the present case, the agency's interest in making a factual record to enable it to apply its expertise is not so compelling as to outweigh the severe burden that will be imposed on Shapiro if he is denied judicial review.

**B.**

In considering the second governmental interest mentioned in *McKart,* it is well to remember that the defendant in that case was not found to have deliberately flouted the administrative process even though he had neither sought a personal appearance before the local board nor appealed. By contrast, in *McGee v. United States, supra,* the defendant not only refused to appear or to appeal, but burned his draft card, announced unequivocally his policy of noncooperation with the draft board, and refused to communicate in any way with the board. In *McGee,* there was clearly a deliberate flouting of the administrative process.

The present case presents a wholly different set of circumstances. Shapiro

---

5. The issue in McKart, *supra,* was the proper construction of the statutory exemption for the sole surviving son.

6. There was apparently no discussion of the merits of Shapiro's application during his first appearance on January 24, 1966.

made three personal appearances before the board, and he was in constant communication, sending eight letters to the board between the date he was first notified of his 1–A classification and his pre-induction physical in July, 1966. Moreover, as stated below, I find that although Shapiro failed to perfect an appeal, he made a significant effort to pursue his administrative remedies to their conclusion.

The government attaches great significance to the fact that Shapiro allowed the ten-day appeal period to pass after the April 22 notice of classification. It contends that Shapiro's statement in his June 8 letter that "I chose to relinquish my right to appeal" establishes that his failure to appeal constituted a knowing waiver. However, the government's contention ignores several factors.

■ First, as of June 8, 1966, Shapiro's appeal rights had not been extinguished by the lapse of the ten-day period after April 22. On June 6, the board had made an appointment for Shapiro with a government appeal agent. Under 32 C.F.R. § 1626.2(b), which was then in effect, an appeal agent could take an appeal " * * * at any time before the registrant is mailed an Order to Report for Induction * * *." [7] Thus on June 6, the board in effect renewed his right to appeal through an appeal agent. At no time did Shapiro expressly waive this right.

■ The government's construction of Shapiro's June 8 statement, "I chose to relinquish my right to appeal", ignores the context of the statement. First, the statement refers in the past tense to a past decision to allow the appeal period to lapse. By the time he wrote his June 8 letter, Shapiro had obviously revoked his decision, for in the sentence following the claimed "waiver",

he stated that he would meet with the appeal agent: "If, however, some quirk in my case requires an appearance before the Government Appeal Agent, I shall be glad to comply * * *." Second, the agency could not accept the purported waiver without accepting the reason given for it. The stated reason was the alleged statement by the local board chairman that any appeal would be futile. This is not a proper basis for a waiver. *United States v. Rabe, supra.* 466 F.2d at 788.

The board's replies to Shapiro's letters either contained misinformation as to his rights or were wholly unresponsive to his inquiries. In such circumstances, it seems doubtful that his actions were based on full information. In answer to Shapiro's request on June 8 for a one-week postponement of his appointment with the appeal agent, the board wrote back that it must have a written statement that he was relinquishing his appeal rights. This reply was both unresponsive, and, according to the government's position on this motion, inaccurate. In his June 15 and June 17 letters, Shapiro requested "an explanation of why I must *specifically* relinquish my right of appeal and what this will mean." These requests went unanswered.

In his four letters to the board in June, 1966, Shapiro never waived his right to appeal through an appeal agent. In his last letter before the board revoked his right to appear before the agent, Shapiro said: "* * * if it is necessary, I shall make arrangements to be available for an appointment with the Government Appeal Agent. * * *" To this the board chairman inexplicably answered on June 20, 1966: "There will be no need for you to appear before the Government Appeal Agent. This is based on your statement that you were

---

7. The board could also extend the appeal period simply by sending Shapiro a new notice of classification.

In addition, under 32 C.F.R. § 1626.2(d), the board was authorized to permit a registrant to appeal after the ten-day appeal period

if it found that the failure to appeal within the ten-day period "was due to a lack of understanding of the right to appeal or to some cause beyond the control of [the registrant]."

relinquishing your right to appeal." The board never restored Shapiro's right to an appointment with an appeal agent despite Shapiro's statement on June 23 that he had not relinquished his appeal rights. As noted, his counsel's request for an appeal the following year was also denied.

In each of the two principal exhaustion cases in this circuit and district, the defendant had previously perfected an appeal and been denied relief, and the issue was whether he was required to appear at "courtesy" interviews or take a second appeal from actions by the board *subsequent* to his first appeal. *United States v. Holby, supra; United States v. Meyer*, 362 F. Supp. 1131 (S.D.N.Y.1973). As noted, the defendant here did not perfect an appeal. However, in *Holby, supra*, 477 F.2d 654, the Second Circuit cited with approval the Seventh Circuit's decision in *United States v. Rabe, supra*, where the registrant made several personal appearances before the local board, but failed to take an appeal. In holding that the registrant had nevertheless exhausted his administrative remedies, the court noted the board's failure to respond to the registrant's inquiries; the possibility that the agency's failure to state any reason for its action would have rendered any appeal futile; and the defendant's apparent lack of understanding of his right to appeal.

■ The present case is similar to *Rabe*, at least in respect of the first two factors. Shapiro's requests for information were met by a bewildering series of unresponsive letters from the board and finally by cancellation of his appointment with the appeal agent. Moreover, as stated below, the agency did not provide any statement of reasons for its actions which might form a basis for an appeal.

In summary, Shapiro did not deliberately flout the administrative process, and to allow judicial review to all registrants who are similarly situated would not encourage such deliberate flouting. Moreover, the facts do not show that Shapiro waived his right to an administrative appeal of his 1–A classification.

### C.

■ In considering the third factor mentioned in *McKart*, I am mindful of the Supreme Court's admonition in *McGee v. United States, supra*, that an "insubstantial procedural default" by the defendant should not bar judicial review "simply because the interest in time-saving self-correction by the agency is involved." 402 U.S. at 484–85, 91 S.Ct. at 1569. As I have stated, the principal procedural default was on the part of the agency. Moreover, the agency had ample time and adequate information to correct its errors the most obvious of which was its failure to give reasons for its actions.

In summary, I find that the third governmental interest, like the first two, is insufficient to outweigh Shapiro's interest in judicial review.

### II.

"[W]here an applicant states a *prima facie* case for classification as a conscientious objector and the local board fails to state its reasons for denial of the application, thus precluding meaningful administrative review, a conviction based on the board's 1–A classification must be reversed. [citations omitted]" *United States v. Stewart*, 478 F.2d 106, 112–13 (2d Cir. 1973); *Lenhard v. United States*, 405 U.S. 1013, 92 S.Ct. 1296, 31 L.Ed.2d 477 (1973); *Joseph v. United States*, 405 U.S. 1006, 92 S.Ct. 1274, 31 L.Ed.2d 437 (1973); *United States v. Nagler*, 484 F.2d 38, 43 (2d Cir. 1973); *United States v. Holby, supra*.

Shapiro's application and correspondence with his local board satisfied, *prima facie*, the three basic requirements for conscientious objector classification under § 6(j) of the Universal Military Training and Service Act, 50 U.S.C.App.

§ 456(j): [8] (1) that the registrant's opposition to war be based upon religious training and belief, *Welsh v. United States*, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L. Ed.2d 733 (1966); (2) that the applicant be conscientiously opposed to war in any form, *Gillette v. United States*, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); and that his objection be sincere, *Witmer v. United States, supra.*

### A.

In *Welsh v. United States, supra,* the Supreme Court explicated the requirement that the registrant's opposition to war be based on "religious training and belief." The Court stated that the objection must derive from "moral, ethical, or religious beliefs":

> "What is necessary * * * for a registrant's conscientious objection to all war to be 'religious' within the meaning of § 6(j) is that this opposition to war stem from the registrant's moral, ethical, or religious beliefs about what is right and wrong and that these beliefs be held with the strength of traditional religious convictions." 398 U.S. at 339–40, 90 S. Ct. at 1796.

The Court thus eliminated any prior requirement that the registrant's beliefs be grounded in one of the traditional religions. *See also Warren v. Laird,* 353 F.Supp. 730, 735 (S.D.N.Y.1972) (Cooper, J.).

 In the present case, Shapiro's application presents an even stronger statement of objection by virtue of religious training and belief than did the defendant's application in *Welsh.* First,

unlike the registrant in *Welsh*, Shapiro was able to sign the statement in Series I.B. of the application that he was opposed to war "by reason of [his] religious training and belief." As the Supreme Court said in *United States v. Seeger, supra,* 380 U.S. at 184, 85 S.Ct. 850, a registrant's characterization of his own beliefs as religious should carry great weight. Second, Shapiro's answer to a question as to the source of his training and belief (Series II, Question 3) clearly indicated that the source of his beliefs was religious training: [9]

> "3. In school and at home I was exposed to be [sic] basic ideals of the Judeo-Christian culture—I took these ideals seriously."

By contrast, the applicant in *Welsh* stated that his beliefs were formed " 'by reading in the fields of history and sociology.' " 398 U.S. at 341, 90 S.Ct. at 1797.

In Series II, Question 1 of the application, Shapiro was unable to state without qualification that he believed in a "Supreme Being", responding instead: "Depends on meaning of Supreme Being." However, in *Welsh*, where the applicant first denied that he believed in a Supreme Being, and then stated that he must leave the question open, the Supreme Court said that an individual need not assert a belief in a Supreme Being as that term is traditionally understood:

> "If an individual deeply and sincerely holds beliefs that are purely ethical or moral in source and content but that nevertheless impose upon him a duty of conscience to refrain from participating in any war at any time, those beliefs certainly occupy in the life of

---

8. Prior to 1967, 50 U.S.C. App. § 456(j) provided in pertinent part:

"Nothing contained in this title shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Religious training and belief in this connection means an individual's

belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but does not include essentially political, sociological, or philosophical views or a merely personal moral code."

9. Shapiro's beliefs were also partly shaped by "[r]eading from the classics to contemporary philosophy."

that individual 'a place parallel to that filled by * * * God' in traditionally religious persons." 398 U.S. at 340, 90 S.Ct. at 1796.

Shapiro's application is a thorough and apparently thoughtful and sincere exposition of his convictions, on the basis of which a local board would be fully justified in finding that his beliefs occupied a place in his life "parallel to that filled by * * * God." There is no evidence whatever to suggest that his beliefs were not "held with the strength of traditional religious convictions."

 The fact that Shapiro indicated in Series IV, Question 2 that he was not a "member of a religious sect or organization" could not disqualify him from conscientious objector classification. *United States v. Meyer, supra*, 362 F. Supp. at 1135.

 Finally, the government contends that Shapiro's membership in the "U. S. Committee to Aid the National Liberation Front"—noted on his application—demonstrates that his opposition to the United States' involvement in Vietnam was "merely political." However, neither Shapiro's membership in this organization nor his letter of February 13, 1966, setting forth certain political objections to the Vietnam War disqualified him under the statutory exclusion for persons with "essentially political, sociological, or philosophical views or a purely personal moral code." In *Welsh v. United States, supra,* where the defendant wrote a letter showing that his objections were "undeniably based in part on his perception of world politics," the Supreme Court said:

> "We certainly do not think that § 6(j)'s exclusion * * * should be read to exclude those who hold strong beliefs about our domestic and foreign affairs or even those whose conscientious objection to participation in all wars is founded to a substantial extent upon considerations of public policy." 398 U.S. at 342, 90 S.Ct. at 1798.

The Court also said that the exclusion should not be construed to "restrict the category of persons who are conscientious objectors by 'religious training and belief'", *Id.* at 343, 90 S.Ct. at 1798. That is, having found that Shapiro's objections were derived from religious training and belief, the local board could not disqualify him because he also had "political, sociological, or philosophical" objections to war.

### B.

 In *Gillette v. United States, supra,* 401 U.S. at 443, 91 S.Ct. at 832, the Supreme Court held that in order to qualify for the conscientious objector exemption, a registrant must demonstrate "conscientious opposition to participating personally in any war and all war." Contrary to the government's contention that Shapiro's objections were selective and that he was opposed to the Vietnam War alone, Shapiro's application clearly states, *prima facie,* a "claim of conscience running against war as such." 401 U.S. at 446, 91 S.Ct. at 834. Shapiro signed the Series I.B. statement that he was "opposed to participation in war in any form". In addition, he stated that it was "impossible for [him] to take part in, or support, any aggressive military organization or action" (Series II, Question 2):

> "2. I believe there are certain Ideals which apply to all men. They concern the duties men have toward each other: to aid one another when necessary and possible, etc., and, above all, to respect every man's right to live. Those who believe themselves justified in condemning another man to death merely exhibit atavistic tendencies which should be despised by their fellow men.
>
> "'Thou shalt not kill' is a terse expression of this Ideal. If all men refuse to kill, there will never be a war—man has come far enough from the jungle beast to be able to discuss, reason and negotiate. This is the only hope for a self-destroying world.

·"My commitment to these ideals, my belief in the inviolability of human life, make it impossible for me to take part in, or support, any aggressive military organization or action."

By negative implication, Shapiro's statement of opposition to "aggressive military * * * action" might be construed to mean that he would participate in a "defensive war." It seems more likely, however, that the limitation to aggressive action is intended to refer to Shapiro's answer to Series II, Question 5, where he stated that he might use force to defend himself or another individual:

> "5. Force does not mean violence; force is the action necessary to protect oneself in an attack or to protect someone else who is being attacked. Thus, force may be a moral force—an example—without anything physical done, or it may be a restraining action.
>
> "Any action done to protect a life—short of maliciously injuring someone, or murder—may be justified, if it is truly protection, not violence. The force of a good example is the wisest and most powerful force."

It is settled that a willingness to use force in self-defense or in defense of one's home, family or other members of the community does not undermine a claim of opposition to all wars. *Gillette v. United States, supra,* 401 U.S. at 448, 91 S.Ct. 828; *Warren v. Laird, supra,* 353 F.Supp. at 734. Shapiro's statement that his opposition to "aggressive military * * * action" was based on the "inviolability of human life" also supports his claim that he conscientiously objected to all war.

■ I must also reject the government's contention that Shapiro's claim of opposition to all war is contradicted by his statement of five "purely political" reasons for opposition to the Vietnam War in his February 13th letter.

In *Welsh v. United States, supra,* 398 U.S. at 342, 90 S.Ct. at 1797, as noted, the court stated that a registrant could not be disqualified from the exemption because his "conscientious objection to participation in all wars is founded to a substantial extent upon considerations of public policy." [10] Nor does the fact that Shapiro expressed opposition to the Vietnam War in particular undermine his claim. It would be strange if a defendant were opposed to war in general and yet did not also object specifically to the Vietnam War. *Kessler v. United States,* 406 F.2d 151, 155 (5th Cir. 1969).

### C.

■ As I have said, Shapiro's application indicates that his beliefs were sincere, *Witmer v. United States, supra,* and there is no evidence in the record to the contrary.

In sum, defendant's application makes a *prima facie* claim of opposition to all war based on religious training and belief.

### III.

I find that Shapiro's local board gave no statement whatever of its reasons for denial of his application. Thus the indictment must be dismissed. *Lenhard v. United States, supra; Joseph v. United States, supra; United States v. Nagler, supra; United States v. Stewart, supra; United States v. Holby, supra.*

■ The government invites the court's attention to the "Summary of Personal Appearance" dated February 14, 1966, and signed by the board chairman, which reads as follows:

> "Reg. in. Claims he is conscientious objector.
>
> "Objects to Vietnamese Involvement.
>
> "Of Jewish faith, altho. alleges he is not an observing Jew.
>
> "Class 1A so reg. may have appeal rights." (Exhibit 5C).

---

10. The government's argument on this point is more properly addressed to the religious training requirement than to the requirement of opposition to all wars.

The government claims that the reference to "Vietnamese Involvement" is an adequate statement of the board's reasons for its action.

I do not regard this document as a statement of the board's reasons primarily because it does not even purport to be a statement of the board. It purports only to be a notation of "new information" submitted by the *registrant*. Furthermore, it is not signed by the three board members who rejected Shapiro's application.

Even assuming that Exhibit 5C is a statement of reasons by the board, it is less comprehensive and clear than statements found to be *inadequate* by the Second Circuit. *Compare United States v. Nagler, supra; United States v. Stewart, supra.* As the court said in *United States v. Nagler, supra,* 484 F.2d at 43, the purpose of the requirement that the board state its reasons is to permit meaningful review by an appeal board. In *Stewart,* the local board had in fact stated in some detail its reasons for believing that the registrant was not opposed to all war. However, the Court of Appeals found the board's statement to be inadequate primarily because it was equivocal and a reviewing board could not determine the precise ground of the local board's decision. In the present case, if the phrase, "[o]bjects to Vietnamese Involvement," is deemed to state a reason for the board's action, it is still subject to several interpretations. It may mean either that Shapiro's objections were political, rather than religious, or that he was found not to be opposed to all war. Alternatively, the phrase may indicate that the board applied an incorrect standard, erroneously concluding that opposition to the Vietnam War in particular was in some sense inconsistent with opposition to all war based on religious training and belief. In any event, the document does not state a proper basis for the board's action such as selective objection, lack of religious foundation, or lack of sincerity. Finally, both *Stewart* and *Nagler* emphasize that the board must set forth in detail the factual basis of its conclusions. Such a statement of facts is clearly lacking in the instant case.

Because of its ambiguity and incompleteness, the statement of reasons in this case, if such it is, is inadequate under the standards laid down in *Stewart* and *Nagler*.

For the foregoing reasons, defendant's motion to dismiss the indictment is granted.

So ordered.