UNITED STATES of America, Plaintiff,

v.

FAIRLANE MEMORIAL CONVALES-
CENT HOMES, INC., Defendant.

Civ. A. No. 77–71877.

United States District Court,
E. D. Michigan, S. D.

Oct. 22, 1980.

Karl R. Overman, Asst. U. S. Atty., Detroit, Mich., Denise Rodriguez, Health and Human Services, Washington, D. C., for plaintiff.

David Lebenbom, Southfield, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

### I. BACKGROUND

#### A. Facts

The United States filed this action on July 29, 1977 against Fairlane Memorial Convalescent Home, Inc. (hereinafter "Fairlane") to collect alleged overpayments that Fairlane had received while participating in the Medicare program during the period of January 12, 1967 through March 31, 1972.[1] Fairlane's participation in the Medicare program, which was commenced with the execution of an agreement with the Secretary of Health, Education and Welfare (hereinafter "Secretary"), was subsequently voluntarily terminated by Fairlane.[2]

In brief, Fairlane provided services to Medicare program beneficiaries. The Secretary, through an Intermediary who had been previously nominated by Fairlane, paid Fairlane the reasonable cost of those services rendered. Since it would be unrealistic to expect a Provider to absorb the daily costs, with reimbursement only at the end of the fiscal year, a system of interim payments was devised. These interim payments, which are made at least monthly, are contingent upon the Provider furnishing cost records at the end of each year. These records must document the claim by the Provider that the costs were actually incurred and reasonable. The cost records are audited at the request of the Intermediary by a certified public accounting firm to determine whether the interim disbursements represent an overpayment or an underpayment of actual and necessary costs that have been incurred in providing services to Title XVIII beneficiaries.

 Upon an audit of the cost reports which had been furnished by Fairlane, it was determined that Fairlane's interim payments exceeded its actual and necessary costs by the sum of $77,465.94 during the six years of its participation. When Fairlane was notified of the adjustment, and of its right to a hearing to contest the adjustment, Fairlane filed for Declaratory Judgment and Injunctive Relief in District Court,[3] seeking to enjoin the Secretary from commencing any collection action prior to an Intermediary Hearing. Pursuant to a Stipulation by the parties, Fairlane was (1) renotified of its right to a hearing and (2) requested to identify all issues that it disputed. Fairlane disputed then, as it does now, only two issues: (1) adjustments to owner's compensation costs and (2) the re-

---

1. The term "Medicare program" is the popular designation of the Health Insurance for the Aged and Disabled Act, which was first enacted as Subchapter XVIII of the Social Security Act of 1965, Pub. L. No. 89 97, 79 Stat. 291, codified, as amended, at 42 U.S.C. § 1395 et seq. (1976).

2. Although the Department of Health, Education and Welfare (hereinafter HEW) was redesignated as the Department of Health and Hu-

man Services on May 4, 1980, 45 Fed.Reg. 29,642 (1980), the agency involved was HEW at all times relevant to this action. Therefore, the Court herein will continue to refer to the agency as HEW.

3. Fairlane Memorial Conv. Home, Inc. v. Weinberger, et al., No. 1966 73 (D.D.C. Dec. 28, 1973).

capture of accelerated depreciation costs, which comprise $54,043.00 of the Secretary's total claim of $75,158.94.[4]

A three–member Panel, one of whom was chosen by Fairlane, presided over the hearing on May 6, 1976. The Panel upheld the Intermediary's determination as to the compensation issue, but reversed (2–1) on the depreciation issue. Upon a request for reconsideration from the Health Care Financing Administration (hereinafter "HCFA"), the Panel reversed itself six months later as to the depreciation issue, thus sustaining the Intermediary's position on both issues. When Fairlane did not respond to the Intermediary's written demand for payment, dated July 7, 1977, the United States brought this action for a judgment in the sum of $75,158.94, together with interest from November 19, 1976 (the date of the final hearing decision), plus costs.

4. The Court is relieved that the parties do not contest the dollar amounts due because the administrative record which details that amount relies on often illegible accounting work papers and nonexplanatory summary ledgers. As well as the Court can decipher, the amount is the total of the following:

| | Owners Comp Adjustment | Depreciation Adjustment |
|---|---|---|
| Cost Year Ended 1967 | $17,706 | $4,133 |
| Cost Year Ended 1968 | 11,687 | 1,108 |
| Cost Year Ended 1969 | 10,965 | 218 |
| Cost Year Ended 1970 | 4,839 | 10 |
| Cost Year Ended 1971 | 3,404 | (77) |

TOTAL OF DISPUTED ITEMS: $53,993 *

* Detailed for the Secretary at Administrative Record (hereinafter "A.R."), Tab ' 12, C I dd and reiterated by the Intermediary's Affidavit at pp. 5 6 and agreed to by Fairlane's counsel at A.R. Tab ' 9, p. 6

The Secretary's total claim is as follows:

| | |
|---|---|
| $74,724.54 | Initial settlement liability A.R. Tab ' 1 |
| 2,741.40 | Adjusted liability for c/y/e 1967 and 1969, id. |
| $77,465.94 | October 15, 1973 demand letter at A.R. Tab ' 1 |
| (2,307.00) | Post hearing adjustment for c/y/e 1968 and 1969 at A.R. Tabs '' 2 and 3, respectively |
| $75,158.94 | TOTAL CLAIMED, A.R. Tab '' 1, 12–7–76 Balance |

The total amount claimed ($75,158.94), less the disputed amount ($53,993.00) which is attributable to owner's compensation and depreciation recapture, leaves the amount of $21,165.94 as the amount that Fairlane undisputedly owes to the Secretary as a reimbursement of excessive

This matter is now before the Court on Plaintiff's Motion for Summary Judgment.

Briefly, the Secretary's position is that this Court lacks subject matter jurisdiction to review the Agency's determination. Alternatively, the Secretary argues that even if subject matter jurisdiction exists, judicial review is generally limited to the compensation and depreciation issues, and specifically limited to the question of whether the administrative decision was arbitrary, capricious, or contrary to law. In her Reply Brief, the Secretary makes the additional argument that Fairlane has waived its right, if any ever existed, to judicial review by failing to file a compulsory counterclaim, pursuant to *Fed.R.Civ.P.* 13(a). Further, the Secretary contends that rescission of such a waiver is now barred by the doctrine of laches.

interim payments received. During oral argument before this Court on September 19, 1980, Fairlane asserted that the entire $75,158.94 claim is in dispute. The Court will not discuss that argument since the law is well settled that parties are precluded from raising issues *ab initio* that were not argued in administrative proceedings. *McKart v. United States*, 395 U.S. 185, 193 ·195, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969); *United States v. Graham*, 471 F.Supp. 123 (S.D.Tex.1979). *See* Plaintiff's Brief at 18 n. 15:

> The exhaustion of administrative remedies doctrine has been utilized by courts in many contexts to preclude a party from raising issues in court for the first time when the party has chosen not to avail himself of the opportunity to raise these issues at the administration level. *E. g., McGee v. United States*, 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971) (enforcement of the Selective Training and Service Act–criminal violation); *United States v. Ruzicka*, 329 U.S. 287, 67 S.Ct. 207, 91 L.Ed. 290 (1946) (enforcement of the Agricultural Marketing Agreement Act with respect to milk "handlers"); *Yakus v. United States*, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944) (enforcement of the Emergency Price Control Act-criminal violation); *United States v. Southern Ry. Co.*, 364 F.2d 86 (5th Cir. 1966), *cert. denied*, 386 U.S. 1031, 87 S.Ct. 1479, 18 L.Ed.2d 592 (1967) (enforcement of an order of the Interstate Commerce Commission. *See also, United States v. Lamars Dairy, Inc.*, 500 F.2d 84 (7th Cir. 1974); *Tampa Phosphate R.R. Co. v. Seaboard Coastline R.R. Co.*, 418 F.2d 387 (5th Cir. 1969).

Fairlane alleges that its due process rights and its right to a fair and impartial hearing were violated because (1) the Hearing Panels were not empowered to question the Secretary's methods of arriving at "reasonable compensation" figures or to entertain Constitutional questions, (2) the Secretary failed to supply the Hearing Panel or the Defendant with sufficient facts upon which to make an informed determination, and (3) the decision by the Hearing Panel to reverse itself on the depreciation issue, based on the Secretary's request for reconsideration, was illegal and improper.

In opposition to the Secretary's Motion for Summary Judgment, Fairlane argues that (1) District Courts have jurisdiction to review any Agency decision on Constitutional grounds and (2) after jurisdiction has been assumed, the District Courts may collaterally review other substantive or factual issues that were raised in the "lower tribunal."

As noted by the United States Court of Appeals for the Eighth Circuit in *St. Louis University v. Blue Cross Hospital Service*, 537 F.2d 283, 289 (8th Cir. 1976), *cert. denied*, 429 U.S. 977, 97 S.Ct. 484, 50 L.Ed.2d 584 (1977), "[t]he Medicare statute is a complicated one." Therefore, this Court will briefly review the statute before addressing the parties' specific arguments.

### B. Summary of Applicable Law

The Medicare/Medicaid Program is a federally funded health insurance plan which provides for cost reimbursement to private service providers through insurance carriers who serve as Intermediaries. 42 U.S.C. § 1395 *et seq.* (1965). Responsibility for administration of the Program and rule-making authority has been delegated to the Secretary of the Department of Health and Human Services.[5]

The Program is substantively divided into two parts: Part A, 42 U.S.C. §§ 1395c–1395i–2, provides for hospital insurance benefits through direct payments to hospitals, nursing homes, clinics or home health agencies for inpatient services; Part B, 42 U.S.C. §§ 1395j–1395w, provides for supplementary medical insurance benefits such as physicians' services, drugs and related services. The instant case relates only to Part A and Part C which sets forth miscellaneous provisions, including definitions.

To participate in the Part A Program, service providers enter into an agreement with the Secretary, 42 U.S.C. § 1395cc. As the Provider's option, payment may be made directly by the Secretary, 42 U.S.C. § 1395g (1976), or through a public or private agency or organization as nominated by the Provider, 42 U.S.C. § 1395h(a) (1976), and thereafter referred to as a "fiscal intermediary."[6]

The amount of payment is determined either by the Provider's customary charges on the basis of reasonable costs, whichever is less.[7]

Reasonable cost is that "cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services,

---

5. Designated in pre–1980 years as the Department of Health, Education and Welfare. 42 U.S.C. § 1302. *See* 45 Fed.Reg. 29,642 (1980).

6. For a general discussion of payment procedures, *see* Homer & Platten, *Medical Provider Reimbursement Disputes: An Analysis of the Administrative Hearing Procedure*, 63 Geo.L.J. 107, 109–111 (1974). *See also*, H. McCormick, *Medicare and Medicaid Claims & Procedures* (1977); Epstein, Barry & Wood, *Medicare Reimbursement Controversies & Appeals* (1976).

7. 42 U.S.C. § 1395f(b)(1) (1976) provides:
 (b) The amount paid to any provider of services with respect to services for which payment may be made under this part shall,

subject to the provisions of section 1395e of this title, be
(1) the lesser of (A) the reasonable cost of such services, as determined under section 1395x(v) of this title, or
(B) the customary charges with respect to such services; [Amended June 13, 1978, Pub. L.No. 95 292, § 4(f), 92 Stat. 315. The 1978 Amendment is not relevant to the case at bar.]
Policy considerations underlying the reasonable cost approach are discussed in Weiner, *"Reasonable Cost" Reimbursement for Inpatient Hospital Services Under Medicare & Medicaid: The Emergence of Public Control*, 3 Am.J.Law & Med. 1 (1977).

and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types of classes of institutions, agencies and services." 42 U.S.C. §§ 1395x(v)(1)(A) and 1395f(b)(2) (1976).

■ The statute gives wide discretion to the Secretary in prescribing regulations. Congressional policy is explicitly stated in the statute:

> Such regulations shall (i) take into account ... [all costs] in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by ... [Medicare] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where ... the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

*Id.*

Thus, the overriding policy, which is to be implemented by the Secretary's regulations, is to insure that costs which are attributable to Medicare beneficiaries are not borne by non–beneficiaries and, conversely, that the Medicare program does not reimburse Providers for costs which are properly attributable to non–Medicare patients.[8] If it becomes evident that this policy is not advanced by certain cost determination methods, it is the duty of the Secretary to promulgate corrective regulations.

---

8. *See also*, S.Rep.No.89–404, 89th Cong., 1st Sess., *reprinted* in 1 [1965] *U.S.Code Cong. & Admin.News*, pp. 1943, 1976.

9. 42 U.S.C. § 1395ff provides:

Determinations; appeals

(a) The determination of whether an individual is entitled to benefits under part A or part B of this subchapter, and the determination of the amount of benefits under Part A of this subchapter, shall be made by the Secretary in accordance with regulations prescribed by him.

Against this overview of the statute, the Court will now address the specific issues that have been raised by the parties in this Motion for Summary Judgment.

## II. JURISDICTION

■ The first issue before this Court is whether District Courts have subject matter jurisdiction to review administrative decisions by the Secretary with respect to the Medicare Act.

42 U.S.C. § 405(h) (1970), incorporated into Title XVIII (Medicare Act) by 42 U.S.C. § 1395ii (1976), provides, in relevant part:

> The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No finding of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency *except as herein provided.* (Emphasis added)

The United States Court of Appeals for the Sixth Circuit, in *Chelsea Community Hospital, et al v. Michigan Blue Cross, et al.*, 630 F.2d 1131 (6th Cir. 1980) tells us, "How far § 405(h) is applicable to Medicare · provider reimbursement disputes is a tortured question." The answer turns on the meaning of the phrase "except as herein provided." There are three explicit statutory provisions which meet the exception. First, Congress provided for a review of both beneficiary and provider eligibility disputes and for certain payments disputes by beneficiaries who are not providers. *See.* 42 U.S.C. § 1395ff (1970).[9]

A second exception which conferred jurisdiction on District Courts to review a claims

---

(b)(1) Any individual dissatisfied with any determination under subsection (a) of this section as to

(A) whether he meets the conditions of section 426 or 426a of this title, or

(B) whether he is eligible to enroll and has enrolled pursuant to the provisions of Part B of this subchapter, or section 1395i–2 of this title or section 1819, or

(C) the amount of benefits under part A of this subchapter (including a determination where such amount is determined to be zero) shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial

decision under the Social Security Act, 42 U.S.C. § 405(g), is not incorporated into Title XVIII.[10] The incorporating provision reads:

> The provisions ... of subsections (a), (d)(e), (f)(h), (i), (j), (k), and (l) of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter.

42 U.S.C. § 1395ii.

The Sixth Circuit has held that failure to include § 405(g) in the Medicare Act is not determinative of Congressional intent to preclude such review. *Chelsea Community Hospital, et al. v. Michigan Blue Cross, et al., supra* at 1135.

Third, a review of an Intermediary's decision to require reimbursement by a Provider (i. e., fact situation before us now) is apparently limited to "such review by the Secretary as may be provided for by the [intermediary] agreement...." 42 U.S.C. § 1395h(a) (1976).[11] For pre–1973 cost periods, review was available through § 1395h(a) and through the Intermediary Hearing process, as set forth in 20 C.F.R. § 406.1801 *et seq.*[12]

A review of the administrative record in this matter discloses that these procedures were followed in the instant case.[13]

The critical question is whether § 405(h) is applicable to pre–1973 cases. The Sixth

review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.

(2) Notwithstanding the provisions of subparagraph (C) of paragraph (1) of this subsection, a hearing shall not be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $100; nor shall judicial review be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $1,000.

(C) Any institution or agency dissatisfied with any determination by the Secretary *that it is not a provider of services*, or with any determination described in section 1395cc(b)(2) of this title, shall be entitled to a *hearing thereon by the Secretary* (after reasonable notice and opportunity for hearing) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title. (emphasis supplied)

**10.** For the scope and application of § 405(g) in Title II cases, see *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (disability; no jurisdiction to review agency refusal to reopen case); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (jurisdiction over prehearing suspension of disability benefits exists); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) (widow benefits; jurisdiction exists after administrative hearing and final decision).

*See also, Himmler v. Califano*, 611 F.2d 137, 148 (6th Cir. 1979) (whether Medicare recipients had received due process in pre–termination procedures since a delayed hearing deprived them of interim medical benefits).

**11.** Prior to the Social Security Amendments of 1972, Pub.L.No. 92 603, October 1972, § 1395h(a) provided, in relevant part:

(a) If any group or association of providers of services wishes to have payments under this part to such providers made through a national, State, or other public or private agency or organization and nominates such agency or organization for this purpose, the Secretary is authorized to enter into an agreement with such agency or organization providing for the determination by such agency or organization (*subject to such review by the Secretary as may be provided for by the agreement*) of the amount of the payments required pursuant to this part to be made to such providers, and for the making of such payments by such agency or organization to such providers. (emphasis supplied)

**12.** These regulations are now at 42 C.F.R. § 406.1801 .1890. Congress subsequently broadened the scope of judicial review to include provider reimbursement disputes. The Social Security Amendments of 1972 added section 1878, 42 U.S.C. § 1395oo (1976), see Pub.L.No. 93 484, § 3(b), 88 Stat. 1459 (1974), which created an administrative Provider Reimbursement Review Board to consider provider claims of $10,000 or more. That provision is expressly applicable only to provider cost reports for periods ending after June 30, 1973; *see* § 243(c), *id.*, as set out at a note to 42 U.S.C. § 1395oo. The instant case involves cost report periods prior to that date. However, *Congressional failure to make this amendment retroactive cannot be read as a disapproval of non–statutory review.* *Chelsea Comm. Hosp. v. Michigan Blue Cross Assoc.*, 630 F.2d 1131, at n. 2 (6th Cir. 1980).

**13.** *See* Administrative Record, Tabs ʿʿ 9–30.

Circuit, stating that "[t]he subsection does not have a meaningful application in a case where no statutory review mechanism is available,", opined that § 405(h) is not "applicable in any way to pre–1973 provider reimbursement claims." *Chelsea Community Hospital, et al. v. Michigan Blue Cross, et al., supra* at 1135.

Following *Chelsea*, this Court holds that, inasmuch as § 405(h) does not apply to pre–1973 provider overpayment actions, it has subject matter jurisdiction.

### III. ISSUES RAISED

Since subject matter jurisdiction has been determined to exist, pursuant to 28 U.S.C. § 1331, the Court will now review the two claims which were raised by Fairlane before the Hearing Panel, as well as the Constitutional issue that Fairlane was precluded from raising before the administrative tribunal; namely,

1. The Secretary's use of salary ranges was arbitrary, capricious or contrary to the law;
2. The retroactive recapture of accelerated depreciation was arbitrary, capricious, or contrary to the law;
3. Fairlane's right to a fair hearing was violated because the Hearing Panel was without authority to hear Constitutional issues or to question the Secretary's methods.[14]

Additionally, Fairlane alleged that (1) the Secretary failed to supply either the Defendant or the Hearing Panel with sufficient facts and (2) the decision by the Hear-

ing Panel to reverse itself as to the depreciation issue was improper.

### A. Use of Salary Ranges

42 C.F.R. § 405.426 provides that reasonable costs may include "[a] reasonable allowance of compensation for services of owners . . . *Provided,* the services are actually performed in a necessary function." (Emphasis in original) It is the Intermediary's responsibility to determine whether the owner of a health care facility has set his own salary reasonably or whether it is excessive (unnecessary to efficient service delivery) and, thus, a violation of 42 U.S.C. § 1395x(v)(1)(A) (1980).

The Secretary's regulations state that "Reasonableness requires that the compensation allowance: (i) Be such an amount as would ordinarily be paid for comparable services by comparable institutions; (ii) Depend upon the facts and circumstances of each case." 42 C.F.R. § 405.426(b)(2). To assist in making the determination required by (i) above, the Secretary, through its Intermediaries, conducted a survey which resulted in salary range guidelines.[15] To comport with (ii) above, individual Owner's Compensation Questionnaires were sent to each owner–provider. The information, which is gathered, assists the Intermediary in determining the existence, or nonexistence, of factors which would warrant piercing the ceiling suggested by the guidelines.[16]

Since the ranges were tested against the particular facts and circumstances of each

---

**14.** It is difficult for the Court to isolate Defendant's claims specifically because Defendant did not establish its constitutional grounds with any specificity in the pleadings or during the extended oral arguments.

**15.** The surveys, done on a regional basis, took into account salaries paid, fringe benefits, number of beds at facility, number of hours worked, responsibilities, education, how many assistants were on the payroll separately, service area population, etc. For the years in question, surveys were done in 1968 and 1971; in interim years, an automatic 6% increase was provided. Typical 1968 ranges for Region V (Michigan, Illinois, Indiana, Ohio and Wisconsin) were:

| | |
|---|---|
| Up to 25 beds: | $6,000 – $9,500 |
| 100 to 149 beds: | $10,000 – $16,500 |
| 200 to 249 beds: | $12,000 – $20,000 |
| Over 250 beds: | $13,000 · $22,500 |

Plaintiff's Reply Brief at 3–4; Administrative Record, Tab ' 13–16, 18.

**16.** Factors which would warrant piercing the upper limits are essentially those same factors which are considered by the Internal Revenue Service Commissioner in determining whether owner–shareholders have paid themselves excessive or unreasonable compensation. Such factors include special skills, extraordinary experience, or personal involvement of unusual depth. Administrative Record, Tab ': 9, *see* Plaintiff's Brief, Exhibit "A," at 5.

case, it seems simple enough to summarily dismiss Fairlane's first allegation that it was deprived of due process or that the Secretary acted capriciously, arbitrarily, or not in accordance with the law. The Court is of the belief, however, that the record should show precisely what Fairlane claims is "reasonable compensation." [17]

### CHART OF COMPENSATION CLAIMED (* Designates Less Than Fulltime)

| | 1967 | 1968 | 1969 | 1970 | 1971 |
|---|---|---|---|---|---|
| Owner Richard Sumpter | $76,239 | $92,015 | $134,594 * | $125,000 | $100,000 * |
| Son Charles | Unclear | 20,468 * | 20,096 | 50,000 * | 40,000 |
| Wife Ethel | - - - | - - - | 6,650 | 9,350 | 11,405 * |
| Son Lester | - - - | 10,000 | 25,999 | 26,106 | 25,837 |
| Son Joseph | - - - | 11,452 | 21,413 | 21,388 | 21,500 |
| Son-in-Law | - - - | - - - | - - - | 24,675 | 23,636 |
| Daughter Sharon | - - - | 10,000 | 24,138 | - - - | - - - |
| Unrelated Employee Titled "Administrator" | 14,500 | 16,717 | 18,456 | 20,000 | 20,654 |

The Court agrees with the Secretary that these figures are, on their face, unreasonable and, thus, determines that the Secretary's actions in disallowing the same were not arbitrary, capricious, or otherwise not in accord with law. As the Sixth Circuit recently stated in a Provider termination case, *Green v. Cashman*, 605 F.2d 945, 946 (6th Cir. 1979), "we do not find in the statute authorizing Medicare and Medicaid any legislative intention to provide financial assistance for providers of care for their own benefit. Rather, the statute is designed to aid the patients and clients of such facilities." When an owner and his immediate family take home over a quarter of a million dollars in compensation during a year that a full time unrelated administrator is paid only $18,456 (see 1969 on Chart), the Court can only conclude that Medicare funds were used to financially assist the Provider's owners and not the Provider's patients.

### B. Retroactive Recapture of Depreciation

Regulations, which were adopted in 1970, provide that "[w]hen a provider who has used an accelerated method of depreciation with respect to any of its assets terminates participation in the program ... the excess of reimbursable cost determined by using accelerated depreciation methods ... over the reimbursable cost which would have been determined ... by using the straightline method of depreciation will be recovered ... if the provider has terminated participation in the program, as an overpayment." 42 C.F.R. § 405.415(d)(3)(i).

17. The Court notes the following testimony from the Administrative Record: (1) The owner was completely absent from the facility during three separate audits, from May 18, 1971 to May 28, 1971, from June 1, 1971 to June 18, 1971, from December 11, 1972 to December 18, 1972, Tab ⁶ 9, 15–16. (2) One questionnaire submitted by the owner fails to state that he spent any time at the facility, Tab ⁶ 9, 18. (3) Airline invoices show that he traveled and lived in Kentucky and Florida, as well as in Michigan, Tab ⁶ 9, 33; "his first love is Kentucky," *id.* at 25 and there was indication, contested, that he was a Kentucky resident, *id.* at 17. From the record, it is unclear whether the boat purchased in 1967 (which was disallowed on audit) or whether the six cars purchased in 1969 (including one Cadillac and two Lincolns) comprise part of the compensation reported above or not.

Relying on 42 U.S.C. § 1395x(v)(1)(A),[18] the Secretary applied § 405.415(d)(3)(i) retroactively to Fairlane when it terminated its program participation on March 31, 1972.

Fairlane claims that the retroactive application of the 1970 regulation is unconstitutional. However, Fairlane does not assert that its use of accelerated depreciation as a cost–determining standard is "reasonable." "Reasonableness," as hereinbefore stated, is the linchpin of the Secretary's decision--making power.[19]

This Court agrees with the Secretary that it is unreasonable to permit accelerated depreciation methods in early years without recapture provisions triggered by the premature withdrawal of assets from the Medicare Program. Further, the Secretary is correct that retroactive recapture is permissible under 42 U.S.C. § 1395x(v)(1)(A) even if 42 C.F.R. § 406.415(d)(3) had never been promulgated.[20]

Case law consistently supports our view. *Fairfax Nursing Center, Inc. v. Califano*, 590 F.2d 1297 (4th Cir. 1979); *Summit Nursing Home, Inc. v. United States*, 572 F.2d 737 (Ct.Cl.1978); *Adams Nursing Home of Williamstown, Inc. v. Mathews*, 548 F.2d 1077 (1st Cir. 1977), *disapproved* in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), *as stated* in *Assoc. of Am. Med. Colleges v. Califano*, 569 F.2d 101 (D.C.Cir. 1977). *See also*, 43 A.L.R.Fed. 466; *Springdale Convalescent Center v. Mathews*, 545 F.2d 943 (5th Cir. 1977); *Hazelwood Chronic and Convalescent Hospital, Inc. v. Weinberger*, 543 F.2d 703 (9th Cir. 1976), *vacated*, 430 U.S. 952, 97 S.Ct. 1595, 51 L.Ed.2d 801 (1977), *on remand*, 556 F.2d 981 (9th Cir. 1977).

**18.** In relevant part, the statute provides that the

regulations shall . . . (ii) provide for the making of suitable retroactive corrective adjustments where . . . the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.

The full text of the statute is set out, *supra*, at 1134.

**19.** *See* 42 U.S.C. § 1395x(v)(1)(A) (Supp.1980); *supra*, n. 6 & accompanying text. For a general discussion of accelerated depreciation, *see* Kahn, *Accelerated Depreciation–Tax Expenditure or Proper Allowance for Measuring Net Income?* 78 Mich.L.Rev. 1 (1979).

This Court notes, parenthetically, that no depreciation method can ever capture actual costs until the asset is actually exhausted or obsoleted. The policy of permitting a choice of method is to allow larger allowances in early years (while the owner is burdened with purchase financing costs) on the premise that artificially high costs in early years will be eventually recouped. Early termination from the program, as well as sale of the asset before its useful life ends, destroys that premise. *See* Internal Revenue Code, §§ 1245, 1250 (Recapture of accelerated depreciation on sale of capital asset).

For example, given an asset with a value of $1,000 and a useful life of ten years, depreciation allowable under the straight–line method and under one accelerated (double–declining balance) method equalizes in the eighth year of asset use. If the asset were sold or its participation by the owner terminated at the end of the sixth year, the accelerated method results in an excess of $138 depreciation allowance over the straight–line allowance. On the other hand, if the asset was disposed of in the ninth year, the accelerated method would provide $34 less depreciation allowance than the straight -line method.

**20.** *See* letter from Bureau of Health Insurance, Administrative Record, Tab ' 5:

Depreciation is considered an allowable cost under the program in recognition of the fact that certain assets are used up in providing services to program beneficiaries. While program regulations allow different interim methods of calculating the depreciation, a determination of the amount due the provider for a particular reporting period is essentially an estimate, and total allowable depreciation can only be fixed with certainty after the asset has been disposed of or its useful life exhausted. Accelerated depreciation results in higher allocation of depreciation in the early periods of an asset's depreciable life and lower cost allocations in later periods. If the provider holds the asset for its full useful life and has a relatively steady program utilization during the entire period, the accelerated and straight–line depreciation methods ultimately result in the same program payments . . . . However, if a provider enters the program when assets are new, uses accelerated depreciation and then terminates participation in the program . . . Medicare would, in the absence of an appropriate adjustment, pay a greater share of depreciation of the provider's assets than under straight–line methods.

Defendant cites only one case in support of the opposite view, *Daughters of Miriam Center for the Aged v. Mathews & Blue Cross Association/Hospital Services Plan of New Jersey* [1978] 4 Medicare & Medicaid Guide (CCH), ¶ 29,457 at 9298 (3d Cir. 1978). It need not be discussed at length; it is inapposite since, in *Daughters of Miriam*, the Provider had not terminated from the Program.[21]

## C. Right to Fair Hearing Violated

Fairlane claims also that its right to a fair hearing was violated because the Hearing Panel was without authority to hear Constitutional claims or to question the Secretary's use of salary guidelines in establishing reasonable owner compensation.

Fairlane does not contend that the HEW regulations applied by the Hearing Panel or the Medicare Act are Constitutionally infirm. It simply contends that unless the Hearing Panel accepted evidence in support of Fairlane's challenge to methodology and Constitutional challenges, a "fair hearing" was definitionally impossible. However, Fairlane was afforded its opportunity to present those Constitutional arguments in this Court's judicial review of the proceedings. The Court holds that extensive pleadings and arguments which have been submitted by Fairlane fail to raise a colorable Constitutional claim.

"Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The Court expanded on that aphorism in *Mathews v. Eldridge*, 424 U.S. 319, 334–335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (predetermination evidentiary hearing in disability termination proceed-

ings not necessary) stating, "resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected .... [D]ue process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Analyzing these factors, the Supreme Court in *Eldridge* set minimal due process standards which included notice, opportunity for written response, prompt evidentiary hearing and judicial review thereafter. In dicta, the Court added, "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective method of decisionmaking in all circumstances." *Id.* 348, 96 S.Ct. 909.

All of the above elements, as well as additional factors set out in *Goldberg v. Kelly*, 397 U.S. 254, 266–271, 90 S.Ct. 1011, 1019 ·22, 25 L.Ed.2d 287 (1970) (retained counsel, "impartial" decisionmaker, a decision based on legal rules and evidence adduced at the hearing as well as a written statement of reasons and authority relied upon) were available to Fairlane.

The Court does not address Fairlane's contention that its rights were prejudiced by the Hearing Panel's lack of authority to hear Constitutional challenges since those same challenges are judicially reviewed herein and would have been addressed by the Court of Claims if Fairlane had chosen to use the Secretary. *See Overlook Nurs-*

---

**21.** The Provider therein continued to serve Medicare beneficiaries but had experienced a decrease in utilization. Based on utilization decrease, the Secretary applied a different aspect of 42 C.F.R. § 405.415d(3), as explained in Provider Reimbursement Manual (HIM–15), Sec. 136.4, ¶ 4897D. This provision is triggered when Medicare beneficiary inpatient days drops 25% for any computation period. The

Provider argued that immediate retroactive recapture was an undue hardship because so long as its participation continued, the two depreciation methods would eventually equalize. This is mathematically true, but irrelevant to the case at bar because Fairlane *has* terminated and there is no "down the road" possibility of equalization of the two methods.

*ing Home, Inc. v. United States,* 556 F.2d 500 (Ct.Cl. 1977); *Whitecliff, Inc. v. United States,* 210 Ct.Cl. 53, 536 F.2d 347 (1976), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977).

In *Overlook,* the Plaintiff made two Constitutional challenges which are not dissimilar to Fairlane's contentions here. First, *Overlook* argued that it did not have an impartial decisionmaker since the majority of the Hearing Panel was employed by the Intermediary. *Overlook, supra* at 503. The Court of Claims was not persuaded. No actual bias was alleged and the theory that employees without previous direct responsibility for reimbursement determinations were potentially or inherently biased was too attenuated. *Id.* 504. As to the treatment of overhead costs (such as the owner compensation and depreciation recapture issues here), the Court of Claims, noting that reasonableness is a factual determination, found that the Plaintiff did not sustain its burden of presenting evidence to support the reasonableness of its claim. In the instant cause, Fairlane has not provided any support that its compensation paid to the Sumpter family was reasonable. The Secretary, on the other hand, has met her burden, showing it was not reasonable.

Earlier, the Court of Claims, in *Whitecliff,* similarly disagreed with Plaintiff's assertion that since the Appeal Board was composed of a majority of the Intermediary's employees, it was Constitutionally impermissible under *Goldberg's* "impartial" decisionmaker requirement. The second Constitutional issue addressed was whether retroactive adjustments are *per se* impermissible. The Court remanded on this issue, directing Plaintiff to prove that its actual reasonable costs varied, thus rendering the reimbursement inaccurate. The facts here are sufficiently clear so that a remand is not warranted.

Thus, this Court finds that Fairlane's right to a fair hearing was not violated. There is no indication in the record that the Panel was biased. The use of salary guidelines tempered with data furnished by the owner himself and the retroactive recapture

of depreciation appear factually "reasonable." Further, Fairlane has not presented any evidence to even suggest that its appraisal on its overhead costs are reasonable and, as hereinbefore stated, this Court is hard-pressed to imagine what argument Fairlane could conceivably advance to support any allegation that its compensation paid is reasonable.

### D. Scope of Review Absent Constitutional Question

■ Absent a colorable Constitutional question, it is well settled that the scope of judicial review must be limited to the question of whether the Secretary acted in an arbitrary or capricious manner, abused her discretion, or otherwise not in accordance with the law.

Applying the test stated in *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), *on remand,* 399 F.Supp. 157 (W.D.Ark.1975), *affd.* 425 U.S. 901, 96 S.Ct. 1488, 47 L.Ed.2d 750 (1976), this Court finds that all relevant factors were considered and that there was no clear error of judgment. We find a rational basis for the Secretary's treatment of the facts in this case, as required by *Bowman. Id.* 419 U.S. 290, 95 S.Ct. 444. *See also, St. Joseph Stock Yard Co. v. United States,* 298 U.S. 38, 51 (1936); *Gosman v. United States,* 573 F.2d 31 (Ct.Cl. 1978); *Pleasantview Convalesence & Nursing Center, Inc. v. Weinberger,* 565 F.2d 99 (7th Cir. 1976); *Rothman v. Hospital Services of Southern California,* 510 F.2d 956 (9th Cir. 1975); *Unimed, Inc. v. Richardson,* 458 F.2d 787, 789 (D.C.Cir. 1972).

■ As the Fourth Circuit said in *Fairfax Hospital Association, Inc. v. Califano,* 585 F.2d 602, 608 (4th Cir. 1978), the power to prescribe reasonable costs carries with it the power to determine what is reasonable. Based on a voluminous administrative record, considering all of the facts in a light which is most favorable to Fairlane, and based on the Findings herein,

IT IS HEREBY ORDERED that the Motion for Summary Judgment, heretofore filed by the Plaintiff, shall be, and is, granted.

IT IS FURTHER ORDERED that the Judgment in the sum of $75,158.94, together with interest from November 19, 1976, and costs, shall be, and is, hereby entered in favor of the Plaintiff, United States of America, and against the Defendant, Fairlane Convalescent Memorial Home.

So Ordered.